# DAVID P. BAUER *v.* GEORGE SOUTO ET AL.

## (SC 17583)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille
and Zarella, Js.*

---

\* The listing of justices reflects their seniority status on this court as of
the date of argument.

Argued December 21, 2005—officially released April 25, 2006

*Trina A. Solecki*, city attorney, with whom was *Adrienne DeLucca*, deputy city attorney, for the appellants (defendants).

*Michael F. Romano*, for the appellee (plaintiff).

### Opinion

BORDEN, J. This appeal concerns a contested municipal election for the common council of the city of Middletown (council) that was held on November 8, 2005. The council consists of the twelve candidates who are elected at large and receive the twelve highest number of votes. The plaintiff, David P. Bauer, received the thirteenth highest number of recorded votes. The trial court rendered a judgment ordering a new election

in only one of the fourteen voting districts in city of Middletown (city), to be held on January 24, 2006. Subsequently, we expedited the appeal of the defendants.[1] Following the filing of simultaneous briefs and oral argument before this court, we announced the decision of this court from the bench on December 21, 2005, affirming the trial court's judgment ordering a new election to be held on January 24, 2006,[2] but reversing the judgment as to the scope of that election. Specifically, we ordered the new election to be citywide, and not limited to district eleven, the district in which the contest arose, as ordered by the trial court.[3] We also noted

[1] The defendants in the action brought to the trial court were: George Souto, the head election moderator for the Middletown municipal election; Anthony Marino, the election moderator for voting district eleven, the district in which the contest arose; Mary Augustine and Anton Petras, the election registrar and assistant registrar, respectively, for district eleven; Louis Lapila, James Fortuna, Diane Petras and Diane Skarb, the election checkers for district eleven. In addition, pursuant to the order of the trial court, the plaintiff also served the following persons and officials: all of the other candidates in the election, namely, Earle Roberts, Jr., Brett Hasbrouck, Francis T. Patnaude, Joan A. Inglis, Gerald E. Daley, Elizabeth K. Nocera, Phrances L. Szewczyk, Vincent J. Loffredo, V. James Russo, Joseph E. Bibisi, Frederick J. Terrasi, Robert P. Santangelo, John L. Robinson, Ronald P. Klattenberg, and Thomas J. Serra; as well as Susan Bysiewicz, secretary of the state of Connecticut; Jeffrey B. Garfield, executive director and general counsel of the state elections enforcement commission; Sandra L. Faraci, Middletown Democratic registrar of voters; Janice A. Gionfriddo, Middletown Republican registrar of voters; Louis Russo, Salvatore Feraci, Thimothy Beaudreau, and Joseph Milardo, election checkers in district eleven; Sandra Hutton Russo, town clerk of Middletown; and Linda Bettencourt Teti, assistant town clerk of Middletown.

[2] This court was assured during oral argument in this matter that, having announced our judgment on December 21, 2005, the Middletown officials had ample time to comply with an order to hold a new election on January 24, 2006.

[3] Pursuant to our ruling from the bench following oral argument before this court, a new citywide municipal election for the council was held on January 24, 2006. The official results from that election are as follows: Thomas J. Serra (2909 votes); Joseph E. Bibisi (2743 votes); Elizabeth K. Nocera (2729 votes); Vincent J. Loffredo (2693 votes); Gerald E. Daley (2655 votes); David P. Bauer (2576 votes); Phrances L. Szewczyk (2569 votes); John L. Robinson (2566 votes); Earl Roberts, Jr. (2527 votes); Francis T. Patnaude (2510 votes); Ronald P. Klattenberg (2506 votes); Robert P. San-

that a full written opinion would follow in due course. Hence, we now issue this full opinion.

The plaintiff brought this action pursuant to General Statutes § 9-328,[4] challenging the results of the Novem-

tangelo (2481 votes); Joan A. Inglis (2303 votes); Brett Hasbrouck (2291 votes); V. James Russo (2183 votes); and Frederick J. Terrasi (2122 votes).

[4] General Statutes § 9-328 provides: "Any elector or candidate claiming to have been aggrieved by any ruling of any election official in connection with an election for any municipal office or a primary for justice of the peace, or any elector or candidate claiming that there has been a mistake in the count of votes cast for any such office at such election or primary, or any candidate in such an election or primary claiming that he is aggrieved by a violation of any provision of sections 9-355, 9-357 to 9-361, inclusive, 9-364, 9-364a or 9-365 in the casting of absentee ballots at such election or primary, may bring a complaint to any judge of the Superior Court for relief therefrom. In any action brought pursuant to the provisions of this section, the complainant shall send a copy of the complaint by first-class mail, or deliver a copy of the complaint by hand, to the State Elections Enforcement Commission. If such complaint is made prior to such election or primary, such judge shall proceed expeditiously to render judgment on the complaint and shall cause notice of the hearing to be given to the Secretary of the State and the State Elections Enforcement Commission. If such complaint is made subsequent to such election or primary, it shall be brought within fourteen days of such election or primary to any judge of the Superior Court, in which he shall set out the claimed errors of the election official, the claimed errors in the count or the claimed violations of said sections. Such judge shall forthwith order a hearing to be had upon such complaint, upon a day not more than five nor less than three days from the making of such order, and shall cause notice of not less than three nor more than five days to be given to any candidate or candidates whose election or nomination may be affected by the decision upon such hearing, to such election official, the Secretary of the State, the State Elections Enforcement Commission and to any other party or parties whom such judge deems proper parties thereto, of the time and place for the hearing upon such complaint. Such judge shall, on the day fixed for such hearing and without unnecessary delay, proceed to hear the parties. If sufficient reason is shown, he may order any voting machines to be unlocked or any ballot boxes to be opened and a recount of the votes cast, including absentee ballots, to be made. Such judge shall thereupon, if he finds any error in the rulings of the election official or any mistake in the count of the votes, certify the result of his finding or decision to the Secretary of the State before the tenth day succeeding the conclusion of the hearing. Such judge may order a new election or primary or a change in the existing election schedule. Such certificate of such judge of his finding or decision shall be final and conclusive upon all questions relating to errors in the ruling of such election officials, to the correctness

ber 8, 2005 election for the council. After a trial to the court on November 28, 2005, the trial court, in its memorandum of decision and judgment dated December 5, 2005, ordered a new election to be carried out only in district eleven, and to be held on January 24, 2006. This expedited appeal followed.

The defendants claim that: (1) the trial court lacked subject matter jurisdiction because the city had not been named as a party or given notice of the action; and (2) based on the evidence, the trial court improperly ordered a new election.[5] Therefore, the defendants claim, there should not have been a new election ordered at all.[6] The plaintiff claims that the trial court had subject matter jurisdiction, and does not take issue with the scope of the new election ordered by the court. We conclude that: (1) the court had subject matter

of such count, and, for the purposes of this section only, such claimed violations, and shall operate to correct the returns of the moderators or presiding officers, so as to conform to such finding or decision, except that this section shall not affect the right of appeal to the Supreme Court and it shall not prevent such judge from reserving such questions of law for the advice of the Supreme Court as provided in section 9-325. Such judge may, if necessary, issue his writ of mandamus, requiring the adverse party and those under him to deliver to the complainant the appurtenances of such office, and shall cause his finding and decree to be entered on the records of the Superior Court in the proper judicial district."

[5] The defendants break this one claim down into three different categories: (1) there was insufficient evidence that the mechanical failure of one lever of one voting machine in district eleven would have significantly changed the results of the election; (2) the court improperly ordered a new election in district eleven because there was undisputed evidence that eleven of the twelve members of the council would have been successful anyway; and (3) the trial court improperly disfranchised all of the voters in the other thirteen districts by ordering a new election in district eleven. We address the defendants' first claim separately in part II of this opinion. The defendants' second and third claims, in which they contend, not that the court's remedy was flawed and should have been different, but that, again, no new election should have been ordered at all, are subsumed in our discussion of the first claim.

[6] We emphasize that the defendants' position is that the initial results of the November 8, 2005 election should stand. Thus, they challenge the propriety of the court's judgment ordering a new election, irrespective of its scope.

jurisdiction to order a new election; but (2) the new election may not be limited to district eleven, rather, it must be citywide.

The trial court found the following facts. The plaintiff was a duly registered candidate for election to the council in the November 8, 2005 election. All of the candidates run at large. The council is composed of twelve members, no more than eight of whom may be from the same party. The official citywide results of the election indicated that the plaintiff, a Republican, had received 4235 votes and V. James Russo, also a Republican, had received 4337 votes. In short, Russo received the twelfth highest number of votes, and the plaintiff received the thirteenth highest number of votes. Therefore, Russo was elected to the council and the plaintiff was not.

The trial court also found that there are fourteen voting districts in the city, and that thirty-one voting machines were used in those districts in the election. Some districts, such as districts two, twelve, thirteen and fourteen, had only one machine, and other districts, such as district three, had five machines. The official returns from each district showed that the plaintiff had received approximately 5.54 percent of the total votes cast on each of thirty voting machines, but only 0.4 percent of the total votes cast on machine number 150051, which was located in district eleven.

There were four voting machines used in district eleven, and voters were directed equally to each of the four machines. All of the other council candidates had received vote totals on machine number 150051 that were similar to the number of votes that they had received on the other machines used in district eleven. For example, candidate Francis T. Patnaude had received a total of 201 votes on machine number 135749, 210 votes on machine number 169199, 181 votes on machine number 135760, and 183 votes on machine

number 150051; similarly, candidate Phrances L. Szewczyk had received a total of 193 votes on machine number 135749, 176 votes on machine number 169199, 169 votes on machine number 135760, and 177 votes on machine number 150051. The plaintiff, however, whose name appeared at position 4A on all voting machines, had received 188 votes on machine number 135749, 179 votes on machine number 169199, 169 votes on machine number 135760, and only 12 votes on machine number 150051.

The trial court credited the testimony of Steven Krevisky, a mathematics professor at Middlesex Community College, whose mathematical specialties include statistics. Krevisky testified that, based on an analysis of all of the votes received by the plaintiff on each of the thirty-one machines used in the election, the plaintiff had received a mean[7] of 5.54 percent of the total vote, that the standard deviation for all votes for the plaintiff on all of the machines was .008, that 73 percent of the vote totals were within one standard deviation of the mean, and that 29 percent of the vote totals were within two standard deviations of the mean. Krevisky also testified that the vote total for the plaintiff on machine number 150051 was more than six standard deviations from the mean.[8] He therefore concluded that either the data collected from machine number 150051 had been counted incorrectly or that there was a mechanical defect in the machine.

---

[7] Krevisky explained that the "mean" is simply the numerical average, calculated by adding up the total votes on the other thirty machines and dividing by thirty.

[8] Krevisky explained that the "standard deviation" is a statistical term that "tells you how the scores [are] spread or dispersed about the mean." In particular, the smaller the standard deviation, the closer the numbers are dispersed about the mean, and the larger the standard deviation, the broader the numbers are dispersed about the mean. For purposes of this case, the fact that the standard deviation for machine number 150051 was significantly greater than the standard deviations for all of the other machines indicated that the vote total for that machine was an outlier.

The trial court found that, based on the testimony of the methods used in obtaining the vote tallies from each machine, there was no evidence that the collection of the data was improper. Therefore, the court concluded that there was a mechanical defect in machine number 150051, specifically, at position 4A.[9] The trial court further noted that this conclusion was also supported by evidence that in the 2001 municipal election, the 2002 statewide election, and the 2004 statewide and presidential elections, there was a mechanical defect in position 4A of machine number 150051, which apparently had not been detected at the time of use.[10]

Moreover, the trial court granted the defendants' motion to inspect and test machine number 150051. The court ordered that lever 4A be depressed at least fifty times in combination with the depression of the other levers on the machine so as best to duplicate the operation of the machine during an election. The court further ordered that the count for lever 4A be taken to determine how many times the machine registered a vote when lever 4A was depressed. The result of this test was that, although lever 4A was depressed fifty-one times, it failed to register any votes.

On the basis of all of the foregoing evidence, the trial court found that position 4A on machine number 150051 malfunctioned on the date of the election.[11] Furthermore, the court specifically found that, as a result of the malfunctioning of the machine, "all those who voted

---

[9] The mechanic who inspected machine number 150051 testified that he could not remember doing any specific testing to ascertain whether the machine registered a vote when lever 4A was pulled.

[10] In each of these elections, the candidate whose name was listed on position 4A of machine number 150051 received significantly fewer votes on that machine than he or she did on all of the other machines used in the district in which that machine had been used.

[11] The trial court also noted that the defendants had presented "no evidence to contest the overwhelming evidence which suggested a defect in the voting machine at issue."

for [the plaintiff] in district eleven did not have their vote counted and [the plaintiff] did not have the benefit of all votes for him properly recorded in his favor." Thus, the court found that it is reasonably probable that if machine number 150051 had been operating properly, the plaintiff would have received at least 103 more votes than he had received and, therefore, his vote tally would have been more than that of Russo, who had received the twelfth highest number of votes in the election. Therefore, had machine number 150051 been operating properly, it is likely that the plaintiff, rather than Russo, would have been elected to the council. Accordingly, the trial court concluded that, "[a]s a result of [the malfunctioning of the machine] the reliability of the election for common council in voting district eleven [was] seriously in doubt."

Turning to the remedy, the trial court noted that, although it had afforded the defendants the opportunity to submit a proposed order to the court, they had taken the position that a new election was not warranted and had, therefore, declined to make any suggestions as to a new election. The court, therefore, determined that it had "no option other than the vacating of the results of the [council] election in district eleven and the ordering of a new election [for the council] in that district," in accordance with the order proposed by the plaintiff.[12] Subsequently, the trial court rendered judgment declaring void the results of the election for the council in voting district eleven, and ordering a new election for the council, limited to that district, to be held on January 24, 2006. The trial court further ordered that machine number 150051 was not to be used in the new election.

In addition to the facts specifically found by the trial court, the following facts are undisputed based on the

---

[12] We note that neither the plaintiff nor the trial court considered the option of a new citywide election.

official documents submitted to the trial court. Voters in the election could vote for no more than eight out of the sixteen candidates for council. A total of 10,907 voters voted out of a total registration of 23,771 voters. Assuming that the total registration of 23,771 voters is spread approximately equally among the fourteen voting districts, it is evident that there are approximately 1700 registered voters in district eleven. The official return indicates that the first four highest vote getters were Democrats, whose vote totals ranged from 5927 to 5272; the fifth highest vote getter was a Republican, with a vote total of 5197; the next four highest vote getters were Democrats, whose vote totals ranged from 5155 to 4946; and the last three highest vote getters were Republicans, whose vote totals ranged from 4751 to 4337. As we have indicated, the plaintiff, a Republican, was thirteenth, with a vote total of 4235. Finally, the three lowest vote getters were Republicans, with vote totals ranging from 4208 to 4038. Thus, eight Democrats and four Republicans were elected to the council, and there were four unsuccessful Republican candidates, including the plaintiff.

## I

The defendants first claim that the trial court lacked subject matter jurisdiction over the action because the city was not named as a party defendant. Specifically, the defendants claim that, because it is the city that would run and fund the new election sought, its presence as a party was indispensable for the court's jurisdiction. We disagree.

First, even if we were to assume, without deciding, that the city was an indispensable party, "the failure to join an indispensable party is not a [subject matter] jurisdictional defect." *Eder Bros., Inc.* v. *Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 382 n.10, 880 A.2d 138 (2005). "Except as provided in Sections

10-44 and 11-3 no action shall be defeated by the non-joinder . . . of parties. . . ." Practice Book § 9-19. Additionally, "[a]s set forth in Section 10-39, the exclusive remedy for nonjoinder of parties is by motion to strike." Practice Book § 11-3. The defendants have made no such motion in this case.

Second, in a case such as this, in which an election is challenged after the fact, § 9-328 provides for service on the state elections enforcement commission, certain election officials, the secretary of the state, "and to any other party or parties whom [the] judge deems proper parties thereto . . . ." See footnote 4 of this opinion. It is unlikely that, had the legislature deemed a municipality to be indispensable to the court's subject matter jurisdiction over a challenge to a municipal election filed pursuant to § 9-328, it would have been left to the discretion of the judge whether to summon the municipality.

Third, this record makes it abundantly clear that the municipality was a party to the action in substance, albeit not in form. Numerous municipal officials were named and summoned as defendants in their official capacities; see footnote 1 of this opinion; and they all were and continue to be represented by the city attorney, who would have been the same attorney to represent the municipality had it been formally named or summoned as a defendant. In addition, at the beginning of the trial court hearing, when the city attorney orally raised the question of the absence of the municipality as a party defendant, although not doing so by way of a motion to strike, as required by Practice Book § 11-3, the trial court asked: "So, would the city like to participate?" The city attorney replied: "Yes, Your Honor, the city would like to participate." The court responded: "Well, I think it should. If I have the discretion, then it should. It may." The city attorney then replied: "Thank you, Your Honor." Finally, the city attor-

ney acknowledged in oral argument before this court that, had the city been formally named, she would not have raised any claims or arguments in addition to those that she raised before the trial court. Thus, the defendants' argument that the absence of the city as a party defendant necessarily deprived the court of jurisdiction, would elevate form over substance, which we decline to do in this case.

II

We next address, briefly, the defendants' claim that there was insufficient evidence for the court's finding that the election was rendered seriously in doubt. This claim is utterly without merit.

In *Bortner* v. *Woodbridge*, 250 Conn. 241, 258, 736 A.2d 104 (1999), we concluded that "§ 9-328 does not require a challenger, in order to secure a judicial order for a new election, to establish that, but for the irregularities that he has established as a factual matter, he would have prevailed in the election. We conclude[d] instead that, in order for a court to overturn the results of an election and order a new election pursuant to § 9-328, the court must be persuaded that: (1) there were substantial violations of the requirements of the statute, [such as errors in the rulings of an election official or officials[13] or mistakes in the counts of the votes]; and (2) as a result of those [errors or mistakes], the reliability of the result of the election is seriously in doubt." Our previous recitation of the facts that the trial court found, and of the overwhelming evidence underlying those facts, renders it unnecessary to discuss this claim of the defendants further.

[13] There is no claim in the present case of any erroneous rulings by any election officials. The court's findings, however, clearly establish that the mechanical failure of the machine in question resulted in a substantial mistake in the count of the votes for the plaintiff.

In this regard, we acknowledge that the fundamental background of § 9-328 "counsels strongly that a court should be very cautious before exercising its power under the statute to vacate the results of an election and to order a new election." Id., 253–54. Nonetheless, under the facts properly found by the trial court, it had no other reasonable choice but to do so in the present case. See id., 257 (court should order new election under § 9-328 if statutory requirements are met).

### III

We turn, finally, to the appropriate remedy. We conclude, as we have already indicated, that the only appropriate remedy is a new, citywide election. This conclusion is compelled by the reasoning of our decision in *Bortner* v. *Woodbridge*, supra, 250 Conn. 241.

We begin by noting that there are three reasonably possible options for a remedy: (1) a new citywide election with all candidates participating; (2) a new election limited to district eleven with all candidates participating, which both the plaintiff and the trial court endorsed; and (3) a citywide runoff between the plaintiff and Russo, the next highest vote getter.[14] Under the circumstances of this case and this flawed election, only the first option is consistent with the nature of elections in general and of this election in particular, as well as the democratic process.

In *Bortner*, we elaborated on the nature of an election under our democratic system: "An election is essen-

---

[14] The defendants' suggestion, made at oral argument in this court, that the new election be limited to those voters who actually voted in the first election in district eleven, is patently unreasonable. There is nothing in our law or in our democratic traditions to suggest that, if a voter does not vote in an election, he or she waives his right to do so when the results of that election prove unreliable and a court orders a new election. See, e.g., *Ayers-Schaffner* v. *DiStefano*, 37 F.3d 726, 727 (1st Cir. 1994) (similar suggestion deemed "hardly worthy of discussion" because right to vote "is of the most fundamental significance under our constitutional structure" [internal quotation marks omitted]).

tially—and necessarily—a snapshot. It is preceded by a particular election campaign, for a particular period of time, which culminates on a particular date, namely, the officially designated election day. In that campaign, the various parties and candidates presumably concentrate their resources—financial, political and personal—on producing a victory on that date. When that date comes, the election records the votes of those electors, and only those electors, who were available to and took the opportunity to vote—whether by machine lever, write-in or absentee ballot—on that particular day. Those electors, moreover, ordinarily are motivated by a complex combination of personal and political factors that may result in particular combinations of votes for the various candidates who are running for the various offices.

"The snapshot captures, therefore, only the results of the election conducted on the officially designated election day. It reflects the will of the people as recorded on that particular day, after that particular campaign, and as expressed by the electors who voted on that day. Those results, however, although in fact reflecting the will of the people as expressed on that day and no other, under our democratic electoral system operate nonetheless to vest power in the elected candidates for the duration of their terms. That is what we mean when we say that one candidate has been 'elected' and another 'defeated.' No losing candidate is entitled to the electoral equivalent of a 'mulligan.'

"Moreover, that snapshot can never be duplicated. The campaign, the resources available for it, the totality of the electors who voted in it, and their motivations, inevitably will be different a second time around. Thus, when a court orders a new election, it is really ordering a different election. It is substituting a different snapshot of the electoral process from that taken by the

voting electorate on the officially designated election day." Id., 255–56.

This reasoning leads us to conclude that the new election must be citywide, and not limited to district eleven. Although, as we said in *Bortner*, the new election is really a different election, the court should nonetheless attempt to minimize, rather than to maximize, the differences between the first and new election. Put another way, the new election should be the result of an effort to approximate, as closely as is reasonably possible, the first election.

Applying this principle to the facts of the present case, it is evident that only a new citywide election will achieve these goals. Only a new citywide election will approximate the application of energy and resources that went into the first, flawed election. Conversely, if the new election were to be limited to district eleven, it would not only be a *different* election; it would also be a wholly *different type* of election. It would be an election in which all of the candidates' energies and resources would be concentrated in district eleven, instead of being spread across all fourteen voting districts.

Moreover, an election limited to district eleven would lend itself to "bullet" voting by the voters for one or more candidates—voting for only one candidate, rather than a group of candidates—in order to ensure that one candidate's victory. This procedure would involve a wholly different set of voting incentives than obtained in the first election, in which the voters, unaware of which candidate would finish where, did not have the same set of incentives to cast bullet votes. Because it is undisputed—and undisputable—that, if the new election were limited to district eleven, all of the other candidates would necessarily retain the votes that had been validly cast for them in the other thirteen districts, there would be very strong incentives for candidates to urge, and for voters to choose, bullet voting that

could change the ultimate lineup of successful candidates, both by individual candidate and by party. This possibility is particularly likely, given the relative closeness of the votes for all of the candidates in the first election, and the potential for changing those results, given the fact that there would be approximately 1700 voters in district eleven who would necessarily be eligible to vote in the new election.

The same reasoning compels the conclusion that the new, citywide election be held among all of the candidates, not as a runoff between the plaintiff and Russo, who was the next highest vote getter. A runoff between the plaintiff and Russo would be a wholly different type of election. It would in fact *require* bullet voting, which could entirely change the preexisting lineup of successful candidates, without those candidates having the chance to defend their prior success. In sum, once the trial court nullified the first election, "what needed to be recreated was the 'democratic process' surrounding the selection of [the council], not the particular conditions surrounding the original election." *Ayers-Schaffner* v. *DiStefano*, 37 F.3d 726, 729 (1st Cir. 1994).

It is true that this result yields a more expensive and time-consuming process than either of the other two potential solutions. That, however, is the price of democracy. As Winston Churchill is reported to have said: "Many forms of Government have been tried, and will be tried in this world of sin and woe. No one pretends that democracy is perfect or all-wise. Indeed, it has been said that democracy is the worst form of Government except all those other forms that have been tried from time to time . . . ."[15]

The judgment is affirmed insofar as it nullified the election of November 8, 2005, and ordered a new elec-

[15] Winston S. Churchill: His Complete Speeches 1897-1963 (R. James ed., 1974) vol. VII, p. 7566 (November 11, 1947 speech in House of Commons). We are grateful to Superior Court Judge Jon C. Blue, a Churchill aficionado, who called to our attention, subsequent to the initial publication of this decision, the source of this quotation.

tion to be held on January 24, 2006; the judgment is reversed insofar as it limited the new election to district eleven, and the case is remanded with direction to set the new election for all of the candidates on a citywide basis on the same date.

In this opinion the other justices concurred.