CHRISTOPHER CARUSO *v.* CITY OF
BRIDGEPORT ET AL.
(SC 18012)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and Schaller, Js.

Argued November 30, 2007—officially released February 26, 2008

*Thomas J. Weihing,* with whom were *Joshua F. Nessen* and, on the brief, *John T. Bochanis* and *Janice L. Rosenfeld,* for the appellant-appellee (plaintiff).

*John C. King, John P. Bohannon, Jr.* and *Arthur C. Laske III,* assistant city attorney, with whom, on the brief, were *Michele C. Mount,* assistant city attorney, and *Mark T. Anastasi,* city attorney, for the appellees-appellants (defendants).

*Opinion*

ROGERS, C. J. The plaintiff, Christopher Caruso, brought this action pursuant to General Statutes § 9-329a (a),[1] claiming that the defendant Santa Ayala, the

[1] General Statutes § 9-329a provides: "(a) Any (1) elector or candidate aggrieved by a ruling of an election official in connection with any primary held pursuant to (A) section 9-423, 9-425 or 9-464, or (B) a special act, (2) elector or candidate who alleges that there has been a mistake in the count of the votes cast at such primary, or (3) candidate in such a primary who alleges that he is aggrieved by a violation of any provision of sections 9-355, 9-357 to 9-361, inclusive, 9-364, 9-364a or 9-365 in the casting of absentee ballots at such primary, may bring his complaint to any judge of the Superior Court for appropriate action. In any action brought pursuant to the provisions of this section, the complainant shall send a copy of the complaint by first-class mail, or deliver a copy of the complaint by hand, to the State Elections Enforcement Commission. If such complaint is made prior to such primary such judge shall proceed expeditiously to render judgment on the complaint and shall cause notice of the hearing to be given to the Secretary of the State and the State Elections Enforcement Commission. If such complaint is made subsequent to such primary it shall be brought, within fourteen days after such primary, to any judge of the Superior Court.

"(b) Such judge shall forthwith order a hearing to be held upon such complaint upon a day not more than five nor less than three days after the making of such order, and shall cause notice of not less than three days to be given to any candidate or candidates in any way directly affected by the decision upon such hearing, to such election official, to the Secretary of

Democratic registrar of voters for the city of Bridgeport (city), had violated certain election statutes before and during the September 11, 2007 Democratic primary for the office of the mayor of the city.[2] After an expedited hearing, the trial court rendered judgment for the defendants. The plaintiff then brought this appeal[3] claiming

the State, the State Elections Enforcement Commission and to any other person or persons, whom such judge deems proper parties thereto, of the time and place of the hearing upon such complaint. Such judge shall, on the day fixed for such hearing, and without delay, proceed to hear the parties and determine the result. If, after hearing, sufficient reason is shown, such judge may order any voting machines to be unlocked or any ballot boxes to be opened and a recount of the votes cast, including absentee ballots, to be made. Such judge shall thereupon, if he finds any error in the ruling of the election official, any mistake in the count of the votes or any violation of said sections, certify the result of his finding or decision to the Secretary of the State before the tenth day following the conclusion of the hearing. Such judge may (1) determine the result of such primary; (2) order a change in the existing primary schedule; or (3) order a new primary if he finds that but for the error in the ruling of the election official, any mistake in the count of the votes or any violation of said sections, the result of such primary might have been different and he is unable to determine the result of such primary.

"(c) The certification by the judge of his finding or decision shall be final and conclusive upon all questions relating to errors in the ruling of such election official, to the correctness of such count, and, for the purposes of this section only, such alleged violations, and shall operate to correct any returns or certificates filed by the election officials, unless the same is appealed from as provided in section 9-325. In the event a new primary is held pursuant to such Superior Court order, the result of such new primary shall be final and conclusive unless a complaint is brought pursuant to this section. The clerk of the court shall forthwith transmit a copy of such findings and order to the Secretary of the State."

[2] The plaintiff also named as defendants the following: the city; Hector Diaz, the town clerk for the city; Thomas L. Kanasky, Jr., the head moderator for the city's September 11, 2007 Democratic primary; Joseph Borges, the Republican registrar of voters for the city; Patricia Howard, the deputy Democratic registrar of voters for the city; Jeffrey B. Garfield, the executive director and general counsel for the state elections enforcement commission; and William Finch, a candidate for the office of mayor of the city. After this appeal was filed, the secretary of the state filed a motion to intervene in the appeal for the purpose of opposing the plaintiff's request for relief. This court granted that motion.

[3] The plaintiff originally brought this appeal pursuant to General Statutes §§ 9-325 and 51-199 (b) (5). At the same time that he filed the appeal, he

that the trial court: (1) improperly determined that certain actions by Ayala did not constitute "ruling[s] of an election official" within the meaning of § 9-329a (a) (1); (2) applied an improper standard in determining whether the plaintiff was entitled to a new primary election under § 9-329a (b); (3) improperly disregarded evidence of misconduct by poll workers during the primary election; and (4) improperly excluded certain evidence. Thereafter, the defendants filed a cross appeal claiming that the trial court improperly had denied their motion to dismiss the plaintiff's complaint. We affirm the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. The plaintiff was a candidate for the office of mayor in the city's September 11, 2007 Democratic primary. The defendant William Finch, also a Democratic candidate for the office of mayor, won the primary election by 270 votes.[4] Fourteen days after the primary, on September 25, 2007, the plaintiff filed a complaint in the Superior Court alleging that, before,

filed in this court a motion to stay court orders and to postpone the primary election pending the appeal. After the appeal was filed, this court determined that it would treat the issues raised in the appeal that had not been certified to this court by the trial court in accordance with § 9-325 as if they had been brought in an ordinary appeal to this court. See *Bortner* v. *Woodbridge*, 250 Conn. 241, 245 n.4, 736 A.2d 104 (1999) (although direct appeal to this court pursuant to § 51-199 [b] [5] was improper in absence of certified question pursuant to § 9-325, court treated appeal as if it had been filed in Appellate Court and transferred to this court). Accordingly, this court bifurcated the appeal into a certified appeal pursuant to § 9-325 and an ordinary appeal. We then denied the motion to stay in this appeal; *Caruso* v. *Bridgeport*, 284 Conn. 793, 804, 937 A.2d 1 (2007); and dismissed the certified appeal. *Caruso* v. *Bridgeport*, 284 Conn. 805, 814, 937 A.2d 7 (2007).

After this appeal was filed, the secretary of the state filed a motion to intervene in the appeal for the purpose of opposing the plaintiff's motion to stay and to postpone the primary election. This court granted the motion to intervene for that purpose. The secretary of the state has not participated in the merits of the plaintiff's appeal or the defendants' cross appeal.

[4] The record does not reveal the number of votes that were received by each candidate.

during and after the primary, Ayala had engaged in conduct that violated various election statutes. In his original complaint, the plaintiff stated that he was bringing the action pursuant to General Statutes § 9-328, governing contests in general elections, but he later clarified in his second amended complaint that he was bringing the action pursuant to § 9-329a. In each complaint, the plaintiff sought orders that (1) all of the voting machines used in the Democratic primary election be impounded beyond the automatic fourteen day impoundment period provided for in General Statutes § 9-310, (2) no Democratic nominee for mayor be recognized before the case was resolved, (3) the plaintiff be declared the winner of the Democratic primary for the office of mayor, (4) a new primary election be held and (5) the ballots cast in the primary election not be examined, unlocked or otherwise inspected except by order of the court.

The trial court ordered an expedited hearing on the matter to be held beginning on October 3, 2007. The trial court also issued an ex parte order that all of the voting machines used in the primary, as well as certain other materials related to the election, be impounded, pending further order by the court.

The expedited hearing concluded on October 15, 2007, and, on October 24, 2007, the trial court issued its decision. The court rejected the plaintiff's argument that Ayala's " 'conscious disregard of nondiscretionary mandates constitutes a ruling that is challengeable as conduct *interpreting* a statute applicable to the electoral process.' " (Emphasis in original.) Rather, the court concluded that "an interpretation of a statute, an act that satisfies the definition of a 'ruling' under *Bortner* [v. *Woodbridge*, 250 Conn. 241, 736 A.2d 104 (1999)], requires the election official to look to the statute, ascertain what it *is* meant to convey, and then apply that interpretation to the primary." Applying this

interpretation to the plaintiff's claims, the trial court concluded that many of the alleged statutory violations by Ayala did not constitute " 'ruling[s]' of an election official," as specified by § 9-329a, and, therefore, did not come within the scope of an action pursuant to § 9-329a. With respect to the actions by Ayala that colorably constituted rulings by an election official, the court concluded that the plaintiff had failed to prove: (1) that the rulings were improper; (2) that the results of the primary might have been different if the rulings had been different; or (3) what the outcome would have been if the rulings had been different. Accordingly, the trial court rendered judgment for the defendants and, pursuant to § 9-329a (b), certified its decision to the secretary of the state. Thereafter, upon motion by the defendants, the trial court vacated the order impounding the voting machines.

The plaintiff then filed this appeal. See footnote 3 of this opinion. Thereafter, the defendants filed a cross appeal claiming that the trial court improperly had denied their motion to dismiss the plaintiff's complaint for lack of subject matter jurisdiction. The plaintiff claims on appeal that the trial court improperly concluded that Ayala's conscious disregard of various mandatory election statutes did not constitute rulings of an election official within the meaning of § 9-329a (a) (1).[5]

---

[5] The plaintiff states in his brief that, "depending upon its ruling on this appeal," this court might need to immediately address the following question: "Does the Superior Court or Supreme Court have authority under . . . § 9-328 to overturn a general election and order a new one based on the voiding of a primary election which chose one of the candidates for the general election?" The plaintiff has not briefed this issue, however, and we therefore deem it abandoned.

On the third day of trial, the plaintiff requested permission to file a third amended complaint alleging that there had been a mistake in the vote count under § 9-329a (a) (2). The defendants objected to the request to amend, and the trial court denied the request on the ground that the third amended complaint stated a new cause of action and was untimely. Although the plaintiff claims in his brief, more or less in passing, that the trial court "should have permitted the [t]hird [a]mended [c]omplaint, which specified

He further claims that the trial court applied an improper standard in determining whether the improper rulings entitled him to a new primary election under § 9-329a (b) because the outcome of the election could not be determined. Specifically, he contends that the trial court improperly rejected his claim that he was entitled to a new election because Ayala's improper rulings made it impossible to determine *reliably* the outcome of the election. The plaintiff also claims that the trial court improperly disregarded and excluded certain evidence in support of his claim that the election results were unreliable. The defendants dispute these claims and claim on cross appeal that the trial court improperly denied their motion to dismiss the complaint on the ground that the plaintiff had failed to cite the correct statutory authority for his claim within the fourteen day time period mandated by § 9-329a (a).

the disparity between the votes in the machine and the number of voters checked in at the polls," he did not brief this claim. Specifically, he did not explain why he believes that his request to file the third amended complaint was timely or why his claim that a number of votes were *cast unlawfully* should be treated as a claim that the votes were *counted incorrectly*. Accordingly, we also deem this claim abandoned.

Finally, we note that, in the second amended complaint, the plaintiff alleged that "[t]he erroneous rulings of . . . Ayala in failing to properly appoint moderators, provide training, and give the [plaintiff's] campaign required and timely notices of the right to have one-half of the poll workers, constituted official neglect of her statutory duties in violation of [General Statutes §] 9-355." On the second day of trial, the defendants pointed out that that claim only could have been made under § 9-329a (a) (3). The defendants then argued that § 9-329a (a) (3) dealt only with claims of aggrievement involving the casting of absentee ballots, and pointed out that no such claim had been made by the plaintiff. When counsel for the plaintiff agreed that no such claim had been made, counsel for the defendants stated, "So . . . [w]e're not going under [subsection (a) (3)]." The trial court then asked counsel for the plaintiff whether he was alleging that the plaintiff was "aggrieved by rulings of an election official" under § 9-329a (a) (1), and counsel for the plaintiff responded in the affirmative. When counsel for the defendants then stated, "We just took [subsection (a) (3)] out of the picture," the court responded, "Right." The plaintiff did not object to this ruling by the trial court and does not challenge it on appeal to this court. Thus, this appeal involves only the plaintiff's claims pursuant to § 9-329a (a) (1).

We reject both the plaintiff's claims on appeal and the defendants' claim on cross appeal.

I

We first address the defendants' claim on cross appeal that the trial court improperly denied their motion to dismiss the complaint.[6] The defendants contend that, because an action pursuant to § 9-329a was the plaintiff's exclusive remedy, and because he failed to cite that statute as the basis for his complaint until after the fourteen day time period for bringing such a claim had expired,[7] the trial court lacked subject matter jurisdiction over the matter. The plaintiff contends that, because he complied with the procedural requirements of § 9-329a, and because the defendants were aware of the true nature of the action and were not prejudiced by his failure to cite the proper statute in the original

[6] Although the parties have not raised the issue in their briefs to this court, there is some question as to whether the defendants were aggrieved by the trial court's decision and, therefore, have standing to raise this claim on appeal. " 'Ordinarily, a party that prevails [at trial] is not aggrieved.' " *Albahary* v. *Bristol*, 276 Conn. 426, 434 n.5, 886 A.2d 802 (2005); see also *King* v. *Sultar*, 253 Conn. 429, 434, 754 A.2d 782 (2000) ("[i]t is well established that the subject matter jurisdiction of the Appellate Court and of this court is governed by [General Statutes] § 52-263, which provides that an aggrieved party may appeal to the court having jurisdiction from the final judgment of the court" [internal quotation marks omitted]). We may treat the defendants' claim, however, as an alternate ground for affirmance. *Albahary* v. *Bristol*, supra, 434 n.5.

"Ordinarily, we would consider the defendant's alternate [ground] . . . for affirmance only after finding merit in at least one of the claims raised on appeal. [O]nce the question of lack of jurisdiction of a court is raised, [however, it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it before proceeding further with the case." (Internal quotation marks omitted.) *Dow & Condon, Inc.* v. *Brookfield Development Corp.*, 266 Conn. 572, 578–79, 833 A.2d 908 (2003).

[7] General Statutes § 9-329a (a) (3) provides in relevant part that "[i]f [a] complaint is made subsequent to such primary it shall be brought, within fourteen days after such primary, to any judge of the Superior Court." The city's Democratic primary was held on September 11, 2007, and the fourteen day period expired on September 25, 2007, the date that the plaintiff filed his original complaint.

complaint, the defect did not implicate the trial court's subject matter jurisdiction. We agree with the plaintiff.

The following additional facts and procedural history are relevant to this claim. In the plaintiff's original and first amended complaints, he alleged that "[t]his petition and complaint is presented and brought, inter alia, pursuant to . . . § 9-328." Section 9-328 governs contests and complaints in general elections for municipal officers. Thereafter, the defendants filed a motion to dismiss the complaint, claiming that the plaintiff "has incorrectly sought review of the Democratic [p]rimary [e]lection for the [n]omination for [m]ayor of the [c]ity . . . under . . . § 9-328, as opposed to . . . § 9-329a, which is the sole remedy available to the plaintiff." The trial court denied the motion, but ordered the plaintiff to amend his complaint to specify its precise statutory basis. Twenty-two days after the primary election, on October 3, 2007, the plaintiff filed a second amended complaint in which he made substantially the same factual allegations as in the original and first amended complaints and correctly cited § 9-329a as the statutory provision authorizing his complaint.

"As a preliminary matter, we set forth the standard of review. A motion to dismiss . . . properly attacks the jurisdiction of the court, essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court. . . . A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the trial court's ultimate legal conclusion and resulting [decision to deny] . . . the motion to dismiss will be de novo." (Internal quotation marks omitted.) *Beecher* v. *Mohegan Tribe of Indians of Connecticut*, 282 Conn. 130, 134, 918 A.2d 880 (2007).

In support of their claim, the defendants rely on Practice Book § 10-3 (a), which provides: "When any claim

made in a complaint, cross complaint, special defense, or other pleading is grounded on a statute, the statute shall be specifically identified by its number." This court repeatedly has recognized, however, that, "[a]s long as the defendant is sufficiently apprised of the nature of the action . . . the failure to comply with the directive of Practice Book § 10-3 (a) will not bar recovery. . . .

"Additionally, General Statutes § 52-123 provides that [n]o writ, pleading, judgment or any kind of proceeding in court or course of justice shall be abated, suspended, set aside or reversed for any kind of circumstantial errors, mistakes or defects, if the person and the cause may be rightly understood and intended by the court. The purpose of § 52-123 is to afford relief from defects found in the text of the writ itself. . . . It is not the policy of our courts to interpret rules and statutes in so strict a manner as to deny a litigant the pursuit of its complaint for mere circumstantial defects. . . . Indeed, § 52-123 . . . protects against just such consequences, by providing that no proceeding shall be abated for circumstantial errors so long as there is sufficient notice to the parties. . . . The accepted policy is to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court. . . . The design of the rules of practice is both to facilitate business and to advance justice; they will be interpreted liberally in any case where it shall be manifest that a strict adherence to them will work surprise or injustice. . . . Our practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure." (Citations omitted; internal quotation marks omitted.) *Rocco* v. *Garrison*, 268 Conn. 541, 557–58, 848 A.2d 352 (2004).

In the present case, the defendants stated in their motion to dismiss that the plaintiff incorrectly cited § 9-

328 as the basis for his complaint, "as opposed to . . . § 9-329a . . . ." It is clear, therefore, that the defendants were aware that the true statutory basis for the action was § 9-329a. Accordingly, because the failure to cite the statutory basis for the action generally does not bar recovery if the defendants are on notice of its true nature, the plaintiff's failure to cite the correct statutory provision was not a proper basis for dismissing the action. *Rocco* v. *Garrison*, supra, 268 Conn. 557–58.

The defendants claim, however, that, even if the failure to comply strictly with Practice Book § 10-3 (a) ordinarily does not deprive the court of subject matter jurisdiction, when an action is brought pursuant to § 9-329a, the rule *is* mandatory. They contend that, "[g]iven the extremely abbreviated time for determination of party nominees, it is essential that a post-primary challenge by a disappointed candidate proceed to decision with dispatch." They further contend that "[t]he statutory command to 'proceed to hear the parties . . . without delay' [in § 9-329a (b)] . . . conflicts inherently with the ordinary timing of pleadings and motions in civil actions under Practice Book [§ 10-3 (a)] or the ordinary construction given to the rules with respect to the form and content of pleadings." The critical consideration under § 10-3 (a), however, is whether the defendants were on notice of the statutory basis for the plaintiff's claims. See *Michalski* v. *Hinz*, 100 Conn. App. 389, 394, 918 A.2d 964 (2007). Although we recognize the burden that the time constraints of § 9-329a place on the parties, the defendants have not claimed that the plaintiff's failure to cite § 9-329a, in and of itself, prevented them from adequately preparing for trial. Rather, they contend that they were prejudiced because the factual allegations of the plaintiff's complaint were vague and did not support the alleged statutory violations. A motion to strike, however, rather than a motion

to dismiss, is the proper vehicle to attack the legal sufficiency of a complaint. See *Craig* v. *Driscoll*, 262 Conn. 312, 321, 813 A.2d 1003 (2003).

Finally, the defendants claim that the plaintiff's claims pertaining to conduct by election officials prior to the primary were moot when the complaint was brought. They contend that, because § 9-329a (b) authorizes the trial court to order a change in the existing primary schedule, and because the plaintiff had been aware of Ayala's alleged failures to follow the election laws at least as early as September 5, 2007,[8] the plaintiff should have been required to seek that remedy instead of seeking the extreme remedy of a new election. We are not persuaded. Although such equitable considerations could provide grounds for the trial court to deny a request for a new election, the defendants have cited no authority for the proposition that they deprive the trial court of the power to entertain a request for a new election in the first instance. Accordingly, we conclude that the trial court properly denied the defendants' motion to dismiss.

## II

We next address the plaintiff's claims on appeal that the trial court: (1) improperly determined that Ayala's actions, which the plaintiff characterizes as evincing a conscious disregard of nondiscretionary statutory mandates, did not constitute "ruling[s] of an election official" within the meaning of § 9-329a (a) (1); and (2) applied an improper standard in determining whether the plaintiff was entitled to a new election under § 9-329a (b). Specifically, the plaintiff claims that Ayala consciously disregarded: (1) General Statutes § 9-436 (e)[9] when she failed to notify the plaintiff's campaign

---

[8] The defendants point out that the plaintiff complained to the secretary of the state about the alleged failures by Ayala to follow the election statutes by letter dated September 5, 2007.

[9] General Statutes § 9-436 (e) provides: "The registrar shall designate one of the moderators so appointed by the registrar to be head moderator or

of its right to submit a list of designees for moderator and other poll worker positions, failed to apportion one half of the poll worker positions to the plaintiff's campaign and, just four days before the primary election, appointed a Republican as head moderator; (2) General Statutes § 9-229 (a)[10] when she failed to appoint

shall appoint as head moderator an elector who is not also moderator of a polling place and who shall be deemed a primary official. The registrar may also appoint a deputy head moderator to assist the head moderator in the performance of his duties. A deputy head moderator shall also be deemed to be a primary official. Each registrar's appointments of primary polling place officials, except moderators of polling places, and of designees to conduct supervised voting of absentee ballots pursuant to sections 9-159q and 9-159r shall be divided equally, as nearly as may be, between designees of the party-endorsed candidates and designees of one or more of the contestants, provided, if a party-endorsed candidate is a member of a party other than the one holding the primary, such primary officials, except voting machine mechanics, shall be enrolled party members of the party holding the primary. Names of designees and alternate designees for such positions shall be submitted in writing by party-endorsed candidates and contestants to the registrar not later than ten days before the primary, except that names of designees and alternate designees for the position of moderator shall be so submitted not later than twenty-one days before the primary and, if such lists are not so presented, all such appointments shall be made by the registrar but in the above-mentioned proportion. The registrar shall notify all such candidates and contestants of their right to submit a list of designees under this section. Notwithstanding any other provision of this section, the registrar shall appoint as moderators only persons who are certified to serve as moderators or alternate moderators pursuant to section 9-229, unless there is an insufficient number of such persons who are enrolled members of the registrar's party in the municipality or political subdivision holding the primary, in which case the registrar may appoint a new moderator in accordance with section 9-229, but only to the extent of such insufficiency. Primary central counting moderators and absentee ballot counters shall also be deemed primary officials. No primary official shall perform services for any candidate at the primary on primary day."

[10] General Statutes § 9-229 (a) provides in relevant part: "The registrars of voters in the several towns and, in towns where there are different registrars for different voting districts, the registrars of voters in such districts shall appoint the moderators of regular and special state and municipal elections in their respective towns or districts. . . . In the case of a primary, the registrar . . . shall so appoint such moderators and alternate moderators. Moderators and alternate moderators shall be appointed at least twenty days before the election or primary. The registrars shall submit a list of the names of such moderators and alternate moderators to the municipal clerk,

moderators twenty days prior to the election and failed to provide the names of the polling place workers to the town clerk for public inspection; and (3) § 9-436 (d),[11] by understaffing the polls and assigning certain poll workers to multiple positions.[12] We conclude that

which list shall be made available for public inspection by such clerk. Each person appointed to serve as moderator or alternate moderator shall be certified by the Secretary of the State in accordance with the provisions of subsection (c) of this section, except as provided in subsection (d) of this section or section 9-436."

[11] General Statutes § 9-436 (d) provides in relevant part: "The registrar shall appoint from among the enrolled party members in the municipality or political subdivision holding the primary, as the case may be, to serve in each polling place, the primary polling place officials, who shall consist of one moderator, two checkers, not more than two challengers if he deems it necessary, and at least one and not more than two voting machine tenders for each machine in use at such primary and, in towns with two or more voting districts at least one and not more than two assistant registrars, provided (1) in the case of a political subdivision holding a primary, if no enrolled party member who resides in the political subdivision and who is a certified moderator consents to serve as a moderator, the registrar may appoint any enrolled party member who resides in the municipality and is a certified moderator to be moderator, (2) in the case of either a municipality or a political subdivision holding a primary, if no enrolled party member can be found or no such person consents to serve as a moderator, the registrar may appoint any elector who resides in the municipality and is a certified moderator to be moderator, (3) in the case of a political subdivision holding a primary, if an insufficient number of enrolled party members who reside in the political subdivision consent to serve as checkers, challengers, voting machine tenders or assistant registrars, the registrar may appoint any enrolled party member who resides in the municipality to be a checker, challenger, voting machine tender or assistant registrar and (4) in the case of either a municipality or a political subdivision holding a primary, if a sufficient number of enrolled party members cannot be found or do not consent to serve in a position described in subdivision (3) of this subsection, the registrar may appoint any elector who resides in the municipality to any such position. . . ."

[12] The plaintiff also claims that Ayala violated General Statutes § 9-439 when she appointed longtime workers from the Democratic town committee to poll worker positions before offering the positions to the plaintiff's campaign. He argues that § 9-439, which provides in relevant part that "[a]ll officials serving at any primary shall be sworn to the faithful performance of their duties," requires impartiality by poll workers. Nothing in the statute, however, imposes any duty on the registrar of voters. Moreover, the plaintiff merely referred to this statute in passing in his brief to the trial court and the trial court did not address this claim in its memorandum of decision. Accordingly, we do not address it.

these alleged actions colorably constitute rulings of an election official within the meaning of § 9-329a. We further conclude that the trial court applied a proper standard in determining whether the plaintiff was entitled to a new election and properly determined that he was not.

A

We first address the plaintiff's claim that the trial court improperly concluded that Ayala's actions did not constitute rulings of an election official within the meaning of § 9-329a.[13] The following facts and procedural history are relevant to our resolution of this claim.

The plaintiff further claims that Ayala violated General Statutes §§ 9-35 (c) and 9-42 (c), by failing to provide inactive voter lists to the polling places on the day of the primary election. The plaintiff did not brief this claim to the trial court, however, but merely referred to it in passing in a chart included in his trial brief, and the trial court concluded that the claim had not been sufficiently developed during the hearing. Accordingly, we do not address this claim.

Finally, the plaintiff claims that numerous statutory violations and other improper conduct occurred at the polls and other locations during the primary election. The plaintiff makes no claims on appeal, however, that these alleged statutory violations and improper actions constituted rulings of an election official, in and of themselves. Rather he claims that they were the result of the understaffing of the polls which, in turn, was the result of Ayala's improper rulings. Accordingly, we need not determine whether these actions constituted rulings.

[13] We note that a determination that the actions challenged by the plaintiff colorably constitute rulings of an election official within the meaning of § 9-329a is a "predicate for the ordering of a new election" under § 9-329a (b). *Bortner* v. *Woodbridge*, supra, 250 Conn. 259. We further note that the trial court did not deny relief on any of the plaintiff's claims on the ground that Ayala's actions did not constitute rulings, but, instead, concluded either that, even if the actions were rulings, the plaintiff had not established that he was aggrieved by the rulings or that they had affected the result of the primary election. Although the defendants contend that many of Ayala's actions did not constitute rulings, they have not claimed that the trial court lacked jurisdiction to review the merits of the plaintiff's claims without first determining that the actions constituted rulings within the meaning of § 9-329a. It is arguable, therefore, that we need not address the plaintiff's claim that the trial court improperly concluded that Ayala's actions were not rulings. We do so, however, in order to shed some light on this important issue of public interest.

On September 5, 2007, Andrew Grossman, the plaintiff's campaign manager, sent a letter to Susan Bysiewicz, the secretary of the state, in which he stated that Ayala had failed to appoint moderators and assistant moderators at least twenty days before the primary, had failed to submit a list of the names of moderators to the municipal clerk, erroneously had informed Grossman that the plaintiff's campaign would not be "entitled to any particular consideration" when she appointed poll workers, and had "missed deadlines" in informing the campaign about the availability of poll worker positions, all in violation of state election laws.[14] Stacy Zimmerman, another member of the plaintiff's campaign staff, testified at trial that, on the basis of his previous experience in election campaigns, he was aware as of mid-August, 2007, that the plaintiff's supporters were entitled to fill approximately 50 percent of the poll worker positions, but he did not know how many positions there would be or what the positions would be. Zimmerman further testified that he asked for a list of available positions approximately one week before the election and Ayala promptly provided one. There were no moderator positions on the list. Zimmerman testified that when he had called Ayala a day or two before she provided the list, she had told him that the plaintiff's campaign would not be allowed to have moderators at the polling places. William Garrett, the plaintiff's campaign chairman, testified that he also had known in early August, 2007, that the campaign had the right to submit to Ayala a list of designees for poll worker positions, but he did not know what positions were available. Ayala testified that, before August 1, 2007, she had spoken by telephone to Tyrone McClaine, a member of the Finch campaign staff, and Sean Brophy,

---

[14] Grossman did not testify at trial and the plaintiff has not explained the basis for Grossman's statement that Ayala had informed him that the plaintiff's campaign would not be "entitled to any particular consideration" in the appointment of poll workers.

a member of the plaintiff's campaign staff, and notified each campaign of its right to submit names for poll worker positions.

On September 7, 2007, the secretary of the state sent a letter to Grossman in which she stated that, if Ayala had suggested that the plaintiff's campaign was not entitled to any particular consideration in obtaining poll worker assignments, that position was not consistent with the secretary of the state's interpretation of state law. She also stated that state law required that candidates submit their lists of poll worker designees no later than ten days before the primary and moderator designees no later than twenty-one days before the primary. The secretary of the state further stated that Ayala was required "to advise candidates of their right to submit lists of designees. However, it does not specify how long before the deadline this notification should be given, nor does it specify that the notification must be in writing. We will advise [Ayala] that if this notification was not given, [Ayala] should not hold the candidates to these deadlines for submitting lists of designees."

Ayala testified that she extended "the deadlines for submission of poll workers . . . as much as possible . . . ." The reason for the extension was that new voting technology was going to be used at the primary election, including the use of new paper ballots, and poll workers could not be trained on the new technology within the statutory time limits. The secretary of the state had decided in late July, 2007, that the new technology, which was mandated by statute; see Public Acts 2007, No. 07-194; should be used in the September 11, 2007, primary. Ayala also testified that she discussed extending the deadlines with the secretary of the state's office.

Ayala testified that she had asked the defendant Thomas L. Kanasky, Jr., a Republican, to be head moder-

ator before August 16, 2007. She also testified that she had appointed a Republican because she had exhausted the available pool of trained, certified and experienced Democrats in assigning other poll worker positions.

With respect to the plaintiff's claim that Ayala had failed to notify his campaign of its right to submit a list of designees of primary polling place officials[15] as required by § 9-436 (e), the trial court concluded that it need not decide whether Ayala had complied with the statute because several members of the plaintiff's campaign staff had been aware of that right and, therefore, the plaintiff could not have been aggrieved by the alleged failure. With respect to the decision to extend the deadlines for appointing moderators pursuant to § 9-229 (a), the court concluded that it was a ruling by an election official because Ayala had "purposely extended the [statutory] deadlines," but the ruling was justified in light of the need for the moderators to receive specialized training on the optical scan voting technology that was being used for the first time. The trial court also concluded that the plaintiff had not established that Ayala's alleged failure to appoint the plaintiff's designees as polling place officials as required by § 9-436 (e) "was caused by an improper ruling [by Ayala]." Rather, the court concluded that Ayala had extended the deadlines for submitting designees for the positions because of the extenuating circumstances related to the new voting technology and concomitant need to retrain the poll workers. The trial court also noted that Ayala had extended the deadlines in order to accommodate the plaintiff's campaign, his campaign was the only one that took advantage of the extension

---

[15] General Statutes § 9-436 (d) provides in relevant part that "primary polling place officials . . . shall consist of one moderator, two checkers, not more than two challengers if [the registrar] deems it necessary, and at least one and not more than two voting machine tenders for each machine in use at such primary and, in towns with two or more voting districts at least one and not more than two assistant registrars . . . ."

and his campaign simply was unable to fill all of the positions. Moreover, the court concluded that the plaintiff had not established that the results of the election might have been different if more polling worker positions had been allotted to his campaign. Finally, with respect to the plaintiff's claim that Ayala had failed to appoint a head moderator twenty days before the election, and then appointed a Republican, the trial court concluded that § 9-436 (e) did not require the appointment of a Democrat and, in any event, there was no evidence that the outcome of the primary election might have been different but for the appointment.

Before setting forth the law governing our resolution of the plaintiff's claims, we review the general principles governing the judiciary's limited role in elections. See *Bortner* v. *Woodbridge*, supra, 250 Conn. 253. We previously have recognized that, "under our democratic form of government, an election is the paradigm of the democratic process designed to ascertain and implement the will of the people." (Internal quotation marks omitted.) Id., 254. "[E]lection laws . . . generally vest the primary responsibility for ascertaining [the] intent and will [of the voters] on the election officials . . . . We look, therefore, first and foremost to the election officials to manage the election process so that the will of the people is carried out." Id. Moreover, "[t]he delicacy of judicial intrusion into the electoral process . . . strongly suggests caution in undertaking such an intrusion." (Citation omitted; internal quotation marks omitted.) Id. Finally, we have recognized that voters "have a powerful interest in the stability of [an] election because the ordering of a new and different election would result in *their* election day disfranchisement." (Emphasis in original.) Id., 256. "[This] background counsels strongly that a court should be very cautious before exercising its power under the [statutes govern-

ing election contests] to vacate the results of an election and to order a new election." Id., 253–54.

With these general principles in mind, we turn to our standard of review. Whether Ayala's actions constituted "ruling[s] of an election official" within the meaning of § 9-329a is a mixed question of law and fact. The plaintiff, however, does not challenge the trial court's factual findings concerning the actions taken by Ayala in connection with the primary election.[16] Rather, the plaintiff claims that the trial court improperly concluded that these actions, which the plaintiff claims involved "conscious disregard" of certain mandatory statutes, did not constitute "ruling[s] of an election official" within the meaning of § 9-329a. This is a purely legal question involving the proper interpretation of the statute and our review is, therefore, plenary. *Roncari Industries, Inc.* v. *Planning & Zoning Commission*, 281 Conn. 66, 72, 912 A.2d 1008 (2007); *Bortner* v. *Woodbridge*, supra, 250 Conn. 263–64 (applying plenary review to mixed question of fact and law in election case).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z[17] directs us first to consider the text of the statute itself and its relationship to other

---

[16] Indeed, when there was conflicting evidence, the trial court assumed the truth of many of the plaintiff's factual claims.

[17] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Kinsey* v. *Pacific Employers Ins. Co.*, 277 Conn. 398, 405, 891 A.2d 959 (2006). Statutory provisions governing election contests are strictly construed. See *Caruso* v. *Bridgeport*, 284 Conn. 793, 804, 937 A.2d 1 (2007).

We begin our analysis with the language of § 9-329a (a), which provides in relevant part: "Any . . . elector or candidate aggrieved by a ruling of an election official in connection with any primary held pursuant to . . . section 9-423 . . . may bring his complaint to any judge of the Superior Court for appropriate action. . . ." The phrase "ruling of an election official" is not statutorily defined and the parties make no claim that its meaning is clear and unambiguous. We agree. Accordingly, in construing the phrase, we may consider the statute's genealogy and its legislative history.

The provision now codified as § 9-329a originally was enacted in 1955 and provided in relevant part: "Any enrolled member of a political party aggrieved by the ruling of any election official at a primary of such party . . . may . . . bring his complaint to any judge of the superior court . . . ." General Statutes (Sup. 1955) § 608d. This language was amended in 1969 to provide: "Any person claiming to have been elected at a primary and not declared to be so elected; any person claiming that except for the improper action of an election offi-

cial or officials he would have been so elected and any enrolled member of a political party aggrieved by the ruling or claiming an improper action by any election official at a primary of such party . . . may . . . bring his complaint to any judge of the superior court . . . ." Public Acts 1969, No. 622 (P.A. 622), codified at General Statutes (Rev. to 1972) § 9-449. The 1969 amendment also expanded the judicial remedies that were available under the statute, and this expansion was identified as the amendment's primary purpose.[18] See Senate Bill No. 901, 1969 Sess., p. 2 (purpose of amendment was "[t]o provide for an appeal procedure to allow a new primary or certification of a new result in primary elections"); see also 13 H.R. Proc., Pt. 11, 1969 Sess., p. 5144, remarks of Representative William V. Begg (proposed legislation is "of great significance in perfecting the nomination process at its most vital stage by insuring that an effective judicial remedy is provided in appeals from primaries").

In 1978, the relevant statutory language again was amended to provide in relevant part: "Any elector or candidate aggrieved by a ruling of an election official in connection with any primary . . . may bring his complaint to any judge of the superior court . . . ." Public Acts 1978, No. 78-125, § 12 (P.A. 78-125), codified at General Statutes (Rev. to 1979) § 9-329a. The legislative history of P.A. 78-125, § 12, sheds no light on the reasons for the deletion of the phrase "improper action of an election official" from the first sentence of the statute. Compare General Statutes (Rev. to 1977) § 9-449 with General Statutes (Rev. to 1979) § 9-329a. We note, however, that the legislature did not entirely remove the phrase "improper actions" from the statute

---

[18] Specifically, P.A. 622 provided that, in an action pursuant to § 9-449, now § 9-329a, the trial court was authorized to order a new primary or to determine the result of the primary. See General Statutes (Rev. to 1972) § 9-449 (b) and (c).

at that time. Although the statute as amended authorized complaints only by persons "aggrieved by a *ruling* of an election official"; (emphasis added) General Statutes (Rev. to 1979) § 9-329a; the statute continued to authorize a judge to "determine the result of such primary if he finds that *the improper actions* of the election official prevented persons entitled to vote from voting at such primary . . . . "[19] (Emphasis added.) General Statutes (Rev. to 1979) § 9-329a (c). This suggests that the legislature considered an improper action to be one type of ruling.

Finally, the raised committee bill that ultimately was enacted as P.A. 78-125 contained the following statement of purpose: "To impose additional requirements concerning the circulation of nominating petitions, to clarify the power of the superior court in adjudicating election and primary complaints and *to increase such powers*." (Emphasis added.) Raised Committee Bill No. 5595, 1978 Sess., pp. 14–15. The amendment increased the courts' powers in part by broadening the temporal application of the statute.[20] Nothing in the legislative

---

[19] This language was deleted by amendment in 1982. See Public Acts 1982, No. 82-426, § 7. Section 9-329a has been amended several times since 1978 for purposes not relevant to this appeal.

[20] In support of the bill enacted as P.A. 78-125, Claire Jacobs, then the vice chairman of the state elections commission, testified before the joint standing committee on elections that "[t]he bill . . . broadens the statutory grounds on which a contest of an election can be based. Under the present statute, an election or primary may be contested where it is claimed that there was an erroneous ruling made by a moderator on [e]lection [d]ay. This bill provides that an aggrieved party may base a contest on an erroneous ruling made by any election official *in connection with* the election. It makes little sense to limit an aggrieved party's right to contest an election to errors made by one election official on [e]lection [d]ay, when errors made by any number of election officials on days other than [e]lection [d]ay can have as profound an effect on the final outcome of the election." (Emphasis added.) Conn. Joint Standing Committee Hearings, Elections, 1978 Sess., p. 12. This legislative history suggests that the primary purpose of the changes to § 9-329a (a) was to expand the time period during which an improper action by an election official could form the basis for an action pursuant to § 9-329a.

history supports a conclusion that, while the legislature was increasing the courts' powers by broadening the statute in this way, it intended simultaneously to decrease the power of the courts by narrowing the range of official conduct to which the statute applied.

This court first considered the scope and meaning of the phrase "ruling of an election official" as used in § 9-329a in *Wrinn* v. *Dunleavy*, 186 Conn. 125, 138–39, 440 A.2d 261 (1982). The plaintiff in that case was a Democratic candidate for the office of mayor of West Haven who had lost the primary election by eight votes. Id., 126–27. Thereafter, the plaintiff brought an action against his opponent in the primary and several election officials pursuant to § 9-329a alleging that twenty-six primary ballots that had been mailed by persons other than the elector, in violation of General Statutes § 9-146 (b), now codified at General Statutes § 9-140b (b), improperly had been included in the official vote count and in a recanvass, both of which results had been certified by the head moderator of the primary election. Id., 127–30. The trial court concluded that there had been substantial compliance with § 9-146 (b) and rendered judgment for the defendants. Id., 130.

Upon certification by the trial court, the plaintiff then appealed to this court pursuant to General Statutes § 9-325. Id., 130–31. In addition to certifying the plaintiff's question of law, the trial court certified three questions raised by the defendants; id., 131; including the following question: "In a statutory proceeding under § 9-329a, must the alleged misconduct relied on be by an election official. If so, is the alleged misconduct by a person other than an election official within the purvue . . . of the statute?"[21] (Internal quotation marks omitted.)

---

[21] The certified question of law raised by the plaintiff was: "Did the judge err in concluding that elderly electors, casting absentee ballots because of illness or physical disability, substantially complied with mandatory mailing requirements of [§] 9-146 (b) . . . when their ballots were mailed by a person other than persons specifically designated by such statute?" (Internal

Id., 138. This court concluded that, "because the plaintiff would have won the primary had [the improperly mailed] ballots not been counted, he clearly is aggrieved by the ruling of an election official, such 'ruling' being the counting of the absentee ballots." Id., 139. We did not, however, specifically identify the particular election official whose conduct was at issue or what precise conduct constituted a ruling.

Since our decision in *Wrinn*, we have not had occasion to construe the "ruling of an election official" language of § 9-329a. In *Bortner* v. *Woodbridge*, supra, 250 Conn. 267–71, however, this court considered the meaning of the phrase as used in a related statute, § 9-328, governing contests in a general election for municipal officers. In *Bortner*, the plaintiff was one of five candidates for four available positions on the Woodbridge elementary board of education. Id., 246. The plaintiff received the fewest number of votes. Id., 247. Thereafter, he brought an action pursuant to § 9-328 alleging that certain voting machines had malfunctioned during the election. Id., 250–51. He further alleged that, as the result of these malfunctions and " 'various . . . rulings of election officials, there has been a failure to record votes and, consequently, a mistake in the count of the votes cast at the election . . . .' " Id., 251. The trial court determined that "the election officials' failure throughout the day to continue to inspect the voting machines in use for the purpose of ensuring that there were not mechanical problems with those machines, constituted an erroneous ruling." Id., 269. The trial court also concluded that, because there had been mistakes in the vote count as the result of the machine malfunc-

quotation marks omitted.) *Wrinn* v. *Dunleavy*, supra, 186 Conn. 141. Thus, the plaintiff did not appear to be claiming that he was aggrieved by the ruling of an election official; rather, he appeared to claim that he was aggrieved by the conduct of the electors who improperly had cast absentee ballots.

tions and the count had been very close, it should render judgment for the plaintiff and order a new election. Id., 253.

On appeal to this court, the defendants claimed, inter alia, that the trial court improperly had determined that the alleged conduct constituted rulings by an election official or officials within the meaning of § 9-328. Id., 267. After reviewing the definition of " 'ruling' " in several dictionaries,[22] this court concluded that, "as one of the statutory predicates of a judicial order for a new election under § 9-328, namely, 'error in the rulings of the election official,' election officials must have engaged in conduct that incorrectly either (1) decided a question presented to them applicable to the election process, or (2) interpreted some statute, regulation or other authoritative legal statement of requirement applicable to that process." Id., 268. The court then concluded that the alleged failure of the election officials to inspect the voting machines during the election "did not constitute an erroneous ruling. It did not decide, either explicitly or implicitly, a question presented to the election officials regarding the election process, and it did not interpret any statute, regulation or other authoritative legal statement or requirement applicable to that process. It cannot be regarded as anything more than the exercise of election day discretion regarding the proper mechanical functioning of the voting

[22] We stated in *Bortner* that "[a] 'ruling,' according to Webster's Third New International Dictionary (1971), is 'an official or authoritative decision, decree, or statement . . . a decision or rule of a judge or a court . . . an interpretation by an administrative agency of the law under which it operates applicable to a given statement of facts . . . .' Similarly, The American Heritage Dictionary of the English Language (1969) defines a 'ruling' as an 'authoritative or official decision.' In addition, Black's Law Dictionary (6th Ed. 1990), which may be considered as a compendium of the accepted usages of words in the law, depending on their contexts, defines a 'ruling,' consistently with the nonlegal dictionaries, as '[a] judicial or administrative interpretation of a provision of a statute, order, regulation, or ordinance . . . .' " *Bortner* v. *Woodbridge*, supra, 250 Conn. 267–68.

machines, a subject that is committed in the first instance to the authority of the election officials. Given the broad and plenary powers of those officials under our statutes generally, and given the narrow and circumscribed bases for judicial intervention under § 9-328, the exercise of that discretion must be given a wide berth. Although judicial hindsight regarding whether that discretion was properly exercised might in an extreme case provide the basis for a conclusion that votes were miscounted, it cannot convert its exercise into a ruling by the officials." Id., 269–70.

We also stated in *Bortner* that "[t]he plaintiff's reliance on *Wrinn* v. *Dunleavy*, supra, 186 Conn. 138–39, is misplaced. . . . In that case . . . by counting [the] invalid ballots, the election officials implicitly had interpreted the provisions of . . . § 9-146 regarding the casting and mailing of absentee ballots. . . . Thus, *Wrinn* does not, as the plaintiff's argument suggests, stand for the proposition that any act or failure to act by election officials that is relevant to the election process will suffice as a 'ruling' within the meaning of § 9-328." (Citations omitted.) *Bortner* v. *Woodbridge*, supra, 250 Conn. 270.[23]

---

[23] We further concluded in *Bortner* that "[a] plaintiff may not use [§ 9-328 or § 9-329a] to challenge a law or regulation under which the election or primary election is held by claiming aggrievement in the election official's obedience to the law. In such a case the plaintiff may well be aggrieved by the law or regulation, but he or she is not aggrieved by the election official's rulings which are in conformity with the law." (Internal quotation marks omitted.) *Bortner* v. *Woodbridge*, supra, 250 Conn. 270–71; see also *Scheyd* v. *Bezrucik*, 205 Conn. 495, 505–506, 535 A.2d 793 (1987) (challenge to constitutionality of election statute cannot be brought under "ruling of an election official" portion of § 9-328).

We ultimately concluded in *Bortner* that "a mechanical failure of a machine properly to record write-in votes [could] constitute a 'mistake in the count of the votes,'" providing an independent basis for an action pursuant to § 9-328. *Bortner* v. *Woodbridge*, supra, 250 Conn. 272. Because we concluded that any such failure in that case did not undermine the reliability of the election results, however, we concluded that the trial court improperly had rendered judgment for the plaintiff. Id., 277.

The parties in the present case do not dispute that the phrase "ruling of an election official" in § 9-329a (a) has the same meaning as the phrase "ruling of any election official" as used in § 9-328. See *State* v. *Rivera*, 250 Conn. 188, 201, 736 A.2d 790 (1999) ("we may presume that a word used in different parts of the same statutory scheme has the same meaning"). Accordingly, we conclude that our analysis of § 9-328 in *Bortner* is equally applicable to § 9-329a.

We glean the following principles from these cases and from the genealogy and legislative history of § 9-329a. First, although statutes governing election contests generally are construed strictly, nothing in the language, genealogy or legislative history of § 9-329a (a) suggests that the legislature intended for the phrase "ruling of an election official" to have a narrow, technical meaning. Cf. *Bortner* v. *Woodbridge*, supra, 250 Conn. 267 (nothing in legislative history of § 9-328 gives "any indication that it was intended to have some specialized meaning"). Indeed, it appears that the legislature considered an improper action to be a type of ruling.

Second, we implicitly recognized in *Wrinn* that conduct of an election official may constitute a ruling within the meaning of § 9-329a (a) even though the election official had not actually ruled on the matter in any formal way. See *Wrinn* v. *Dunleavy*, supra, 186 Conn. 138–39. In this regard, we note that election officials generally do not conduct trial-type proceedings or issue formal decisions on matters that are presented to them. Instead, they administer the entire election process on a day-to-day basis to ensure that it is fair and orderly, and complies with the various statutory requirements. We see no evidence that the legislature intended to exclude from the scope of § 9-329a (a) improper actions by election officials that violate mandatory statutory requirements, but that do not constitute a ruling in some

formal sense. Nor can we conceive of any reason that the legislature would have intended to exclude such conduct.

We conclude, therefore, that the test that we adopted in *Bortner*, that "a ruling of an election official must involve some act or conduct by the official that . . . interprets some statute, regulation or other authoritative legal requirement, applicable to the election process"; *Bortner* v. *Woodbridge*, supra, 250 Conn. 268; is broad enough to include conduct that comes within the scope of a mandatory statute governing the election process, even if the election official has not issued a ruling in any formal sense. When an election statute mandates certain procedures, and the election official has failed to apply or to follow those procedures, such conduct implicitly constitutes an incorrect interpretation of the requirements of the statute and, therefore, is a ruling.

Applying this interpretation of the word ruling as used in § 9-329a to the plaintiff's claims in the present case, we agree with the plaintiff that Ayala's alleged failure to comply with the mandates of §§ 9-229 (a) and § 9-436 (d) and (e) colorably constituted rulings of an election official.[24]

---

[24] The defendants do not dispute that the relevant statutes are mandatory. They do contend, however, that the statutes do not require interpretation because compliance with them is "ministerial." See *Durrant* v. *Board of Education*, 284 Conn. 91, 95 n.4, 931 A.2d 859 (2007) ("[t]he word ministerial refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion" [internal quotation marks omitted]). They simultaneously contend that election officials have broad and plenary discretionary powers under the statutes and "the exercise of that discretion must be given a wide berth." *Bortner* v. *Woodbridge*, supra, 250 Conn. 269. Regardless of whether compliance with the statutes is ministerial or requires the exercise of discretion, however, the defendants have not explained why the legislature would have intended to exclude conduct by election officials that violates mandatory election statutes from the scope of § 9-329a. Accordingly, we reject this claim.

## B

We next address the plaintiff's claim that the trial court applied an improper standard in determining whether he was entitled to a new primary election as the result of Ayala's rulings. We disagree.

The trial court, relying on this court's interpretation of § 9-329a (b) (3) in *Penn* v. *Irizarry*, 220 Conn. 682, 687, 600 A.2d 1024 (1991), stated in its memorandum of decision that "the plaintiff's burden on the issue of but for causation is, in essence, twofold. Even if the plaintiff establishes that the result might have been different, the plaintiff cannot prevail unless the court is *also* unable to determine the result." (Emphasis added; internal quotation marks omitted.) See also General Statutes § 9-329a (b) (3) (permitting judge to order new primary if he finds that but for alleged errors, "the result of such primary might have been different and he is unable to determine the result of such primary"). The trial court further stated that, "in order to recover under § 9-329a, the [plaintiff] has the burden to establish more than just a violation of title 9 [of the General Statutes]; rather, the [plaintiff] must satisfy, by a preponderance of the evidence, three distinct elements established by case law: (1) a ruling of an election official, as defined by *Bortner*; (2) that was in error; and (3) as a result of this improper ruling, the result of the election might have been different *and* the court is unable to determine the outcome." (Emphasis in original.) In addition, the court stated that, under *Bortner*, "[t]he [plaintiff] must also demonstrate causation, in that as a result of the error, the result of the election is seriously in doubt." See *Bortner* v. *Woodbridge*, supra, 250 Conn. 263.

The plaintiff now contends that the trial court improperly applied the standard that we adopted in *Penn*, instead of what he characterizes as the more lenient *Bortner* standard. Specifically, he contends that, in

*Penn,* this court "too literally construed the language in . . . § 9-329a, so that basically [the plaintiff's] burden became showing that but for the irregularities there *would have been* a different result . . . . [A] [c]ourt can always determine the outcome if results are posted. It is the reliability of those results that is at issue. . . . The [c]ourt basically ignored any consideration of reliability, which became central to its later in-depth analysis in *Bortner* . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.)

Contrary to the plaintiff's contention, however, we did not conclude in *Penn* that a plaintiff cannot prevail in an action under § 9-329a if the trial court is able to determine the result of an election, *regardless* of how unreliable that determination is. We concluded only that the plaintiff in *Penn* could not prevail because the trial court had found that the official misconduct *had not affected the outcome* and the plaintiff had not challenged that finding. *Penn* v. *Irizarry,* supra, 220 Conn. 688. Moreover, the standard that we applied in *Penn* is not inconsistent with the standard that we adopted in *Bortner.* In *Bortner,* we merely emphasized that, although the plaintiff was not required to show by a preponderance of the evidence that he *would have prevailed* if not for the alleged irregularities, the plaintiff must show "(1) there were *substantial* violations of the requirements of the statute . . . and (2) as a result of those violations, the reliability of the result of the election is *seriously in doubt.*"[25] (Emphasis added.)

---

[25] We noted in *Bortner* that the plaintiff had argued "that the legislature, by including a mandate in § 9-329a that a new election may be ordered only when the court determines that the result of such primary might have been different, and not including similar language in § 9-328, has clearly signaled that the challenger to the municipal election need not prove that the result would have been different without the mistake in the count or erroneous rulings." (Internal quotation marks omitted.) *Bortner* v. *Woodbridge,* supra, 250 Conn. 257 n.17. We concluded that there was no need to "decide . . . whether the two statutes contain the same or different standards. Instead, we decide[d] the question of the plaintiff's burden by focusing on the language and legislative history of . . . § 9-328, as well as the role that this

*Bortner* v. *Woodbridge,* supra, 250 Conn. 258; see also *Bauer* v. *Souto,* 277 Conn. 829, 840, 896 A.2d 90 (2006) (plaintiff not required to establish that he would have prevailed in election to prevail in claim under § 9-328, but only that there were substantial errors that placed reliability of election result seriously in doubt).

Nothing in the trial court's memorandum of decision in the present case suggests that the court misunderstood or misapplied our decision in *Penn.* Rather, the court stated at least nine times in its memorandum that the plaintiff could not prevail unless he established that, but for Ayala's conduct, the result of the primary election "might have been different."[26] The court further indicated that a plaintiff could not recover under § 9-329a (b) unless the court was persuaded that "the result of the election is seriously in doubt." See also *Bortner* v. *Woodbridge,* supra, 250 Conn. 258. Accordingly, we reject the plaintiff's claim that the trial court applied an improper standard in determining whether the plaintiff was entitled to a new election.

We further conclude that the trial court properly determined that the plaintiff had failed to establish that, but for Ayala's actions, the outcome of the primary election might have been different. Our standard of

statute plays in the overall electoral process." Id. Those considerations apply equally to § 9-329a. Indeed, *Bortner* suggests that the language of § 9-329a may impose an even heavier burden on a plaintiff seeking a new primary than does § 9-328. Neither the plaintiff nor the defendants in the present case, however, suggest that the *Bortner* standard is inapplicable to the "might have been different" language of § 9-329a. General Statutes § 9-329a (b) (3). Rather, both parties rely on *Bortner*. Accordingly, we now conclude that the *Bortner* reliability standard is applicable to actions brought pursuant to § 9-329a.

[26] At one point in the memorandum, the trial court did state that the plaintiff had not established that, but for the alleged improper certification of the election results, "the results *would* have been different." (Emphasis added.) When the memorandum is read in its entirety, however, it is clear that the trial court properly understood and applied the "might have been different" standard.

review on this matter is plenary. See id., 258 ("although the underlying facts [in an action pursuant to § 9-328] are to be established by a preponderance of the evidence and are subject on appeal to the clearly erroneous standard . . . the ultimate determination of whether, based on those underlying facts, a new election is called for—that is, whether there were substantial violations of the statute that render the reliability of the result of the election seriously in doubt—is a mixed question of fact and law that is subject to plenary review on appeal" [citation omitted]).

At oral argument before this court, the plaintiff clarified that the gravamen of his claim concerning the effect of Ayala's ruling on the election process is that the rulings resulted in the severe understaffing of the polling places on the day of the primary election[27] and in the appointment of a disproportionate number of poll workers who were biased in favor of Finch.[28] In turn, the plaintiff claims, this understaffing resulted in numerous statutory violations by various poll workers and campaign workers that undermined the reliability of the election results.[29]

---

[27] The plaintiff claims that Ayala was required to appoint 138 poll workers to staff twenty-three polling places and that the evidence established that sixty-eight of these positions were unfilled.

[28] The plaintiff claims that his campaign was entitled to sixty-nine poll worker positions and received only nineteen.

[29] Specifically the plaintiff claims that campaign workers advocated for candidates within seventy-five feet of the polling places and poll workers instructed voters to vote for Finch in violation of General Statutes §§ 9-439 and 9-236; Ayala permitted two women to act as Spanish interpreters, including a woman who previously had been barred from the polling places for conducting partisan activities in violation of § 9-439; moderators at two polling locations left ballot bags untended; moderators returned unsealed ballot bags to the town clerk's office; poll officials improperly supervised voters so that there were more votes registered than there were voters who had checked in; and official check lists and tallies were not properly certified in violation of General Statutes § 9-307. The trial court assumed that the plaintiff had proven several of these factual claims but concluded that none of the actions had affected the result of the election.

Upon a careful review of the entire record, however, we are compelled to agree with the trial court that the plaintiff failed to meet his heavy burden of proving that the combined effect of the understaffing of the polling places, the alleged bias of the poll workers and the alleged irregularities was to place the result of the election *seriously in doubt,* thereby entitling the plaintiff to a new election. The evidence simply did not establish that, but for the alleged irregularities, the 270 vote margin between the plaintiff and Finch might have been significantly different.[30] Indeed, the trial court did not find, and our independent review of the record does not reveal, a single instance in which the plaintiff established by a preponderance of the evidence that an alleged irregularity at the polling places had resulted in an improper vote, the improper counting of a vote or the improper failure to count a vote. Rather, the plaintiff is asking the court to engage in conjecture as to how the vote might have been affected.[31] We decline

[30] This court has ordered a new election in two cases: *Wrinn* v. *Dunleavy,* supra, 186 Conn. 152, and *Bauer* v. *Souto,* supra, 277 Conn. 831. In *Wrinn,* the plaintiff was defeated in the primary election by a margin of eight votes and we determined that twenty-five out of twenty-six of the improperly mailed absentee ballots had been cast for the plaintiff's opponent. *Wrinn* v. *Dunleavy,* supra, 129 n.5. In *Bauer,* the trial court found on the basis of undisputed evidence that, if a malfunctioning voting machine "had been operating properly, the plaintiff would have received at least 103 more votes than he had received" and he would have been elected. *Bauer* v. *Souto,* supra, 837.

[31] For example, the plaintiff contends that, when explaining to voters how to fill out the ballot, several poll workers improperly pointed to the ballot line for Finch. In support of this claim, the plaintiff presented testimony by a number of his supporters. He presented no evidence, however, that this alleged behavior actually misled a single voter or affected a vote. Similarly, the plaintiff claims that unofficial Spanish translators improperly were helping Spanish speaking voters, but presented no evidence as to how the voters were affected. Indeed, in his trial brief, the plaintiff argued only that "[t]he election outcome *might have been affected*" by these unofficial translators, not that it *had* been. (Emphasis added.) The plaintiff also claims that a number of poll workers inadvertently left bags full of ballots unattended at the polling places at the end of election day. He presented no evidence, however, that the ballots had been tampered with in any way and argues

to do so. Accordingly, we conclude that the plaintiff has failed to establish that, but for Ayala's rulings, the result of the primary election "might have been different"; General Statutes § 9-329a (b) (3); and that he was therefore entitled to a new election.

Contrary to the plaintiff's suggestion, this conclusion does not mean that the courts are prepared to tolerate the wholesale flouting of the election laws by election officials or a "systematic" failure of the election process. It means only that, under our system of government, the plaintiff bears the heavy burden of *proving* by a preponderance of the evidence that any irregularities in the election process actually, and seriously, undermined the reliability of the election results before the courts will overturn an election. Although we are mindful of the difficulties that plaintiffs face in meeting this burden in light of the statutory time constraints on election contests and the magnitude and complexity of the election process, our limited statutory role in that process and our need to exercise great caution when carrying out that role compel the conclusion that proof of irregularities in the process is not sufficient to overturn an election in the absence of proof that any of the irregularities actually affected the result.

### III

The foregoing analysis resolves the plaintiff's claim that the trial court improperly disregarded evidence of the alleged irregularities at the polling places on the day of the primary election in concluding that the plaintiff was not entitled to a new election. As we have indicated, our careful review of the entire record satisfies us that the trial court properly considered the evidence and concluded that the plaintiff had not established that these irregularities placed the result of

---

in his brief to this court only that the "bags *could well have been* stuffed with extra ballots." (Emphasis added.)

the election seriously in doubt. Accordingly, we reject this claim.

## IV

Finally, we address the plaintiff's claim that the trial court improperly excluded evidence pertaining to certain irregularities at the polling places on the day of the primary election. We disagree.

The following procedural history is relevant to our resolution of this claim. On October 9, 2007, the defendants filed a motion in limine in which they requested that the trial court exclude any evidence offered by the plaintiff that did not support the plaintiff's claims that there had been a ruling by an election official, that the ruling was erroneous and that, as a result, the outcome of the election was placed in serious doubt. The trial court granted the motion.

Thereafter, the plaintiff made an offer of proof that certain "books" that he sought to place in evidence showed that, at four polling places within the 135th district, a greater number of votes had been cast than there were voters who had checked in. The plaintiff represented that there were eighteen more votes than voters at the four locations. On the next day of trial, counsel for the defendants made an offer of proof in which he represented that he had reviewed the books and had checked the count twice. In the first count, he determined that there were the same number of votes and voters in the four locations and in the second count he determined that there was one more vote than voters. The plaintiff now represents that the trial court excluded this evidence, but does not indicate where in the record the court did so or the basis for the ruling.

The plaintiff also made an offer of proof that Anita Martinez, a voter, had observed that blank ballots had been left lying around the polling place where she had

voted and that she had seen a person with two ballots. The defendants objected to the admission of the evidence on the ground that it did not establish either that there had been an improper ruling or that the result of the primary election was in doubt. The trial court sustained the objection.

In addition, the plaintiff claims that the trial court improperly excluded testimony by John Bolton, a campaign worker for the plaintiff, that Ayala had refused to give him voter lists; by Helen Lozak and Cindy Griffin, moderators who had left ballots unattended at polling places; and by Jeffrey Tisdale, another campaign worker for the plaintiff, concerning violations of the statute requiring campaign workers to keep more than seventy-five feet from polling places and concerning a moderator's threat to have him arrested. The plaintiff further claims that the court improperly excluded evidence that Ayala had delayed issuing an order to poll workers to stop pointing to Finch's name when explaining how to fill out the ballot.

The plaintiff contends that this evidence was admissible because it was relevant to his claim that the understaffing of the polling places and the bias of the poll workers affected the election result. He further suggests that the trial court applied an improper standard in excluding the evidence. In support of this claim, the plaintiff cites our decision in *In re Election for Second Congressional District*, 231 Conn. 602, 611, 653 A.2d 79 (1994), for the proposition that the trial court was required to exercise its "discretion in favor of admissibility insofar as possible."

We disagree with the plaintiff's argument that the courts have a special obligation in election contest cases to exercise their discretion in favor of admitting evidence. *In re Election for Second Congressional District* involved a special fact-finding proceeding by this

court pursuant to General Statutes § 9-323, governing election contests arising from elections for United States representatives. The petitioners in that case disagreed as to whether the ordinary rules of evidence should apply in the proceeding. Id., 610–11. We concluded that, "although this is a sui generis proceeding insofar as it requires Justices of the Supreme Court not only to determine the law but to find the facts, it is nonetheless also a judicial, rather than an administrative, fact-finding proceeding and that, therefore, we would apply the rules of evidence, exercising our discretion in favor of admissibility insofar as possible." Id., 611. We made no further statement indicating whether this rule of admissibility was different than the rule applied in ordinary judicial fact-finding proceedings or explaining why it should be. Nor has the plaintiff in the present case explained why he believes that the normal standards of admissibility should not apply here. Accordingly, we conclude that the ordinary rules of evidence apply.

The applicable standard of review for evidentiary challenges is well established. "Unless an evidentiary ruling involves a clear misconception of the law, the [t]rial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . ." (Internal quotation marks omitted.) *Dinan* v. *Marchand*, 279 Conn. 558, 567, 903 A.2d 201 (2006).

Upon a careful review of the record, we also conclude that the trial court properly excluded this evidence as either cumulative of evidence that already had been admitted or as irrelevant to the issues that properly were before the court. None of the evidence added significantly to the plaintiff's claim that the outcome of

the election was seriously in doubt as the result of Ayala's rulings or the understaffing of the polling places. Accordingly, we reject this claim.

The judgment is affirmed.

In this opinion the other justices concurred.