## BRENDA UNGERLAND *v.* MORGAN STANLEY AND COMPANY, INC., ET AL.*

Superior Court, Judicial District of Hartford
File No. CV-09-5030785

Memorandum filed April 5, 2010

*Proceedings*

Thomas P. Willcutts, for the plaintiff.

George D. Sullivan, for the defendants.

* Affirmed. *Ungerland* v. *Morgan Stanley & Co.*, 132 Conn. App. 772, 35 A.3d 299 (2012).

PECK, J. The plaintiff, Brenda Ungerland, filed the two count complaint in this action on June 12, 2009. The defendants are Morgan Stanley & Company, Inc. (Morgan Stanley), a provider of securities brokerage services, and Sharon Kells, an agent of Morgan Stanley. The pertinent facts as alleged by the plaintiff or as set forth in the exhibits are as follows: Ungerland was a customer of Morgan Stanley until August, 2001, during which time she received "false and fraudulent" investment recommendations from the defendants that resulted in her sustaining $400,000 in principal losses. Ungerland instituted an arbitration against the defendants with the National Association of Securities Dealers, Inc. (NASD), seeking damages based on Morgan Stanley's "false and fraudulent misrepresentations" to her concerning her investments. During the NASD arbitration, the defendants "falsely claimed that records pertaining to the plaintiff's accounts, transactions and the defendants' investment recommendations were destroyed as a result of terrorist attacks against the World Trade Center [t]owers on September 11, 2001 . . . ." Thereafter, the defendants, with knowledge of the arbitration claims, destroyed these records in bad faith, which evidenced "their making false and fraudulent misrepresentations to the plaintiff . . . with the intent of thereby depriving the plaintiff, as well as other victims of the defendants' fraudulent conduct, the evidence necessary for [the plaintiff] to prove her claims against them" in the arbitration. As a result, Ungerland was unable to establish a prima facie case in support of her arbitration claims; her arbitration claims failed; and she was denied her claims for damages. In December, 2006, NASD publicly declared that it had discovered that Morgan Stanley and its agents had purposefully destroyed evidence relevant to arbitration proceedings brought by the plaintiff and others with similar claims from October, 2001, and through March, 2005, and instituted regulatory charges against Morgan Stanley. In

2007, NASD was merged with the New York Stock Exchange to form the Financial Industry Regulatory Authority (FINRA), which assumed NASD's regulatory responsibilities. On September 24, 2007, FINRA accepted Morgan Stanley's "Letter of Acceptance, Waiver and Consent," arising out of Morgan Stanley's alleged failure to produce pre-September 11, 2001 e-mail and other documents during the discovery phase of the arbitration.[1] On the basis of this alleged misconduct during the arbitration, Ungerland alleges against both defendants a claim of intentional spoliation of evidence (count one) and a claim of violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. (count two).

On July 23, 2009, the defendants filed a motion to dismiss the complaint for lack of subject matter jurisdiction. The motion is accompanied by a memorandum

---

[1] In a notice dated March 20, 2009, the plaintiff was informed that she had been preliminarily identified as a potential claimant to a fund established for victims of Morgan Stanley's discovery misconduct during certain arbitration proceedings initiated by NASD's office of dispute resolution between July 1, 1999, and December 31, 2005. To participate in the settlement fund, the plaintiff would have been required "to waive any right to seek any other payment from Morgan Stanley that is intended as punishment for the failure to produce pre-September 11, 2001 e-mail" or updates to Morgan Stanley's "Manager's Policies and Procedures Manual." The notice also indicated that claimants "do not waive the right to make any other argument or assert any other claim, to the extent any such claims are available." See exhibit B to affidavit of Thomas P. Willcutts, dated and filed with the court on October 19, 2009 (also exhibit 4 to the plaintiff's memorandum of law in opposition to motion to dismiss [plaintiff's opposition memorandum]). In connection with the e-mail portion of the settlement, the plaintiff was given options that would have allowed her payment as well as "production of relevant, available pre-September 11, 2001 e-mail from Morgan Stanley." It allowed the plaintiff to opt for a standard payment of $3000 to $5000, which would require no proof of the relevance of the e-mail to her arbitration claim, or alternatively, to opt for an independent determination which would have afforded her an opportunity to seek up to $20,000 based on the relevance and impact of the nondisclosed e-mail to her case. The latter option carried with it the downside risk of receiving $0, if no relevance or impact on the arbitration award was established. Id.

of law and a supporting affidavit by the defendants' counsel. The defendants attached the following documents related to the NASD arbitration between the parties to their counsel's affidavit: Ungerland's statement of claim, Ungerland's uniform submission agreement and the arbitration award. Ungerland filed an objection to the motion to dismiss on October 19, 2009. The objection is accompanied by a supporting affidavit by Ungerland's counsel, dated October 19, 2009, to which Ungerland attached a FINRA press release, dated September 27, 2007, announcing Morgan Stanley's settlement with FINRA regarding the regulatory charges, and a notice of settlement, dated March 20, 2009, received by Ungerland as a result of the settlement. She filed a memorandum of law in opposition to the motion to dismiss on November 10, 2009. The memorandum is accompanied by a second affidavit by her counsel, dated November 9, 2009, to which Ungerland again attached the items appended to the previous affidavit as well a FINRA press release, dated November 17, 2007, announcing the Morgan Stanley settlement to its members, and Morgan Stanley's letter of acceptance, waiver and consent to FINRA.[2] On December 2, 2009, the defendants filed a reply memorandum of law. The

_____

[2] The first affidavit of the plaintiff's counsel, dated October 19, 2009, states that the claims being pursued in this lawsuit were unknown to the plaintiff at the time of the arbitration and that the damages being sought herein are distinct from those sought in the arbitration. The second affidavit, dated November 9, 2009, states that during the underlying arbitration the plaintiff sought documents through discovery that Morgan Stanley falsely denied existed. It further states, that as a result of Morgan Stanley wrongful action, the plaintiff was required to compensate for the missing documents by expending extra attorney and expert witness time and expense which likely resulted in "greater forum fees" charged to the plaintiff. The affidavit also asserts that had the plaintiff known of Morgan Stanley's misconduct at the time of the arbitration, she would have sought damages and sanctions as to that misconduct, "independent of whether the misconduct may have impacted the outcome of the underlying arbitration." Finally, the affidavit states that it is damages for the misconduct that the plaintiff now seeks by way of her CUTPA claim.

matter was heard at the short calendar on December 7, 2009. None of the evidence submitted by the parties is contested by the other. There was no request for an evidentiary hearing.

"A motion to dismiss . . . properly attacks the jurisdiction of the court, essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court. . . . A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction." (Internal quotation marks omitted.) *Caruso* v. *Bridgeport*, 285 Conn. 618, 627, 941 A.2d 266 (2008). "The motion to dismiss shall be used to assert . . . lack of jurisdiction over the subject matter . . . ." Practice Book § 10-31 (a).

"Jurisdiction over the person, jurisdiction over the subject-matter, and jurisdiction to render the particular judgment are three separate elements of the jurisdiction of a court. Each element of jurisdiction is dependent upon both law and fact." (Internal quotation marks omitted.) *Castro* v. *Viera*, 207 Conn. 420, 433, 541 A.2d 1216 (1988). "Jurisdiction of the subject-matter is the power [of the court] to hear and determine cases of the general class to which the proceedings in question belong. . . . A court has subject matter jurisdiction if it has the authority to adjudicate a particular type of legal controversy. Such jurisdiction relates to the court's competency to exercise power, and not to the regularity of the court's exercise of that power." (Citation omitted; internal quotation marks omitted.) Id., 427.

"[T]he plaintiff bears the burden of proving subject matter jurisdiction, whenever and however raised." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *New London*, 265 Conn. 423, 430 n.12, 829 A.2d 801 (2003). "[I]n determining whether a court has subject matter jurisdiction, every presumption

favoring jurisdiction should be indulged." (Internal quotation marks omitted.) *Connor* v. *Statewide Grievance Committee*, 260 Conn. 435, 443, 797 A.2d 1081 (2002). "The motion to dismiss . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone. . . . Where, however . . . the motion is accompanied by supporting affidavits containing undisputed facts, the court may look to their content for determination of the jurisdictional issue and need not conclusively presume the validity of the allegations of the complaint." (Internal quotation marks omitted.) *Ferreira* v. *Pringle*, 255 Conn. 330, 346–47, 766 A.2d 400 (2001).

The defendants argue that their motion to dismiss should be granted because the court lacks subject matter jurisdiction over the action because it is an improper collateral attack on a prior arbitration award between the parties. Ungerland argues in opposition that the complaint is not an improper collateral attack on a prior arbitration award, and instead, alleges separate and independent claims from the underlying arbitration.

"Arbitration agreements are contracts and their meaning is to be determined . . . under accepted rules of [state] contract law . . . . Judicial construction of an arbitration agreement, however, is not guided solely by the principles of relevant state contract law. The [Federal] [A]rbitration [A]ct; 9 U.S.C. §§ 1 through 16; governs written arbitration agreements that pertain to contracts involving interstate commerce. . . . The arbitration act creates a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [a]ct . . . . As federal substantive law . . . the arbitration act is to be applied by state courts as well as by federal courts. . . . The purpose of the arbitration act is to ensure that private agreements to arbitrate are enforced according to their

terms. . . . The arbitration act establishes a strong federal policy favoring arbitration. . . . [W]hen Congress passed the [a]rbitration [a]ct in 1925 . . . [i]t intended courts to enforce [arbitration] agreements into which parties had entered . . . and to place such agreements upon the same footing as other contracts . . . ." (Citations omitted; internal quotation marks omitted.) *Hottle* v. *BDO Seidman, LLP*, 268 Conn. 694, 702–703, 846 A.2d 862 (2004). "Section 1 of the [Federal Arbitration Act] defines 'commerce' to include 'commerce among the several States . . . .' 9 U.S.C. § 1. The United States Supreme Court has construed § 1 broadly. The court has explained that 'involving commerce' is the equivalent of 'affecting commerce,' and accordingly, the term 'signals an intent to exercise Congress' commerce power to the full.' . . . *Allied-Bruce Terminix Cos.* v. *Dobson*, 513 U.S. 265, 277, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995)." *Hottle* v. *BDO Seidman, LLP*, 74 Conn. App. 271, 276, 811 A.2d 745 (2002), aff'd, 268 Conn. 694, 846 A.2d 862 (2004).

The parties do not make it abundantly clear whether the substantive law of Connecticut's arbitration statutes, General Statutes § 52-408 et seq., or the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (2008), applies to this case as necessary to resolve the motion before the court. Neither the plaintiff nor the defendants submit any contract, arbitration agreement or any other evidence indicating whether the arbitration at issue was conducted under Connecticut law, federal law or the law of another jurisdiction. If the original contract between the parties involved only intrastate commerce conducted in Connecticut, then the substantive law of the Connecticut arbitration statutes applies as necessary. See *Hottle* v. *BDO Seidman, LLP*, supra, 268 Conn. 702–703. But if the original contract involved interstate commerce, then the substantive law of the Federal Arbitration Act applies, no matter that this case is in state

court. See id. Although the defendants' arguments are plainly based on the premise that the Federal Arbitration Act applies here, they note only once, in a footnote in their memorandum in support of their motion to dismiss, that the arbitration at issue in this case arose out of a contract involving interstate commerce. Since the plaintiff argues that this cause of action is independent of the prior arbitration award, she makes no mention of the nature of the contract from which the arbitration arose or which jurisdiction's substantive law of arbitration applies. Nevertheless, she has not disputed the defendants' contention that the arbitration at issue arose from a contract involving interstate commerce.[3] Further, similar to the defendants, her arguments in support of her objection to the motion to dismiss rely primarily on federal precedent. For these reasons, the court concludes that federal substantive law of arbitration, as contained in the Federal Arbitration Act and federal precedent interpreting it, controls as necessary to resolve this motion to dismiss. See *All Seasons Services, Inc.* v. *Guildner*, 94 Conn. App. 1, 8–9, 891 A.2d 97 (2006) ("[a]lthough the parties based their arguments regarding [whether an arbitrator had the authority to issue a clarification of his final award]

[3] "When issues of fact are necessary to the determination of a court's jurisdiction, due process requires that a trial-like hearing be held, in which an opportunity is provided to present evidence and to cross-examine adverse witnesses." *Standard Tallow Corp.* v. *Jowdy*, 190 Conn. 48, 56, 459 A.2d 503 (1983). On one hand, an evidentiary hearing may be required when the issue pertains to the subject matter jurisdiction of the court over a cause of action. *Golodner* v. *Women's Center of Southeastern Connecticut, Inc.*, 281 Conn. 819, 826, 917 A.2d 959 (2007). On the other hand, "the due process requirement of a hearing is *required only when issues of fact are disputed.*" (Emphasis in original.) *Weihing* v. *Dodsworth*, 100 Conn. App. 29, 38, 917 A.2d 53 (2007). "[I]n the absence of any disputed issues of fact pertaining to jurisdiction, there [is] no need to hold an evidentiary hearing before deciding the motion to dismiss." *Amore* v. *Frankel*, 228 Conn. 358, 369, 636 A.2d 786 (1994). As noted previously, neither the plaintiff nor the defendants claim there is any dispute as to the underlying facts presented to the court in connection with the motion to dismiss.

solely on state law, [the Appellate Court] conclude[s] that the contract between the parties is one involving commerce and, accordingly, look[s] to federal precedent for guidance in our analysis"). This conclusion is further supported by Connecticut precedent explaining that even if the Connecticut arbitration statute were applied, this court's analysis would be guided by federal law. "General Statutes § 52-408 is similar to § 2 of the [F]ederal Arbitration Act, 9 U.S.C § 1 et seq. . . . In construing a Connecticut statute that is similar to federal law, we are guided by federal case law. . . . Thus, when there is no Connecticut case law directly on point, we may turn for guidance to the applicable federal law." *Nussbaum* v. *Kimberly Timbers, Ltd.*, 271 Conn. 65, 73 n.6, 856 A.2d 364 (2004).

While the Federal Arbitration Act has been held to supersede state substantive arbitration law when applied to written arbitration agreements that pertain to contracts involving interstate commerce, "[t]he arbitration act has not been held to supersede state procedural laws." *Hottle* v. *BDO Seidman, LLP*, supra, 268 Conn. 698 n.5. Therefore, when a cause of action related to an arbitration is heard in a Connecticut court, Connecticut procedural arbitration laws, as found in § 52-408 et seq., are normally applied. See id.; *Sultar* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, Superior Court, judicial district of New Britain, Docket No. CV-04-0527411 (October 13, 2004) (*Cohn, J.*) (38 Conn. L. Rptr. 108, 109) ("The [Federal Arbitration Act] covers both substantive law and a procedure for federal courts to follow where a party to arbitration seeks to enforce or vacate an arbitration award in federal court. The procedural aspects are confined to federal cases." [Internal quotation marks omitted.]). The exception to the use of Connecticut procedural arbitration laws by a Connecticut court is when the parties have agreed, whether in an arbitration agreement or at trial, to abide

by the law of a particular state. *Merrill Lynch & Co.* v. *Waterbury*, 34 Conn. App. 11, 15–16, 640 A.2d 122 (1994) ("while the [Federal Arbitration Act] preempts the application of state [substantive] laws that render arbitration agreements unenforceable, it does not preempt the application of state [procedural] law in a case where the parties have chosen in their arbitration agreement to abide by the law of a particular state"). At trial, the parties proceeded under the procedural laws of Connecticut, although their contract provided that it was to be governed by the laws of New York. In the present case, neither party has argued that the parties contractually agreed to abide by the law of a particular jurisdiction.[4] Therefore, under all the circumstances, the procedural laws of Connecticut apply.

General Statutes § 52-418 (a) provides in relevant part: "Upon the application of any party to an arbitration, the [S]uperior [C]ourt . . . shall make an order vacating the award if it finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."[5]

General Statutes § 52-419 (a) provides for an order modifying or correcting an arbitration award under the

---

[4] See footnote 1 of this opinion.

[5] Section 10 (a) of title 9 of the United States Code contains nearly identical language to § 52-418. See 9 U.S.C. § 10 (a) (2008).

following circumstances: "(1) If there has been an evident material miscalculation of figures or an evident material mistake in the description of any person, thing or property referred to in the award; (2) if the arbitrators have awarded upon a matter not submitted to them unless it is a matter not affecting the merits of the decision upon the matters submitted; or (3) if the award is imperfect in matter of form not affecting the merits of the controversy."[6]

The time in which to vacate, modify or correct an arbitration agreement is limited by General Statutes § 52-420, which provides in relevant part: "(b) No motion to vacate, modify or correct an award may be made after thirty days from the notice of the award to the party to the arbitration who makes the motion."[7]

According to federal substantive law, "the [F]ederal Arbitration Act provides the exclusive remedy for challenging acts that taint an arbitration award . . . ." *Corey* v. *New York Stock Exchange*, 691 F.2d 1205, 1211–12 (6th Cir. 1982); accord *Foster* v. *Turley*, 808 F.2d 38, 41–42 (10th Cir. 1986); see *Ibarzabal* v. *Morgan Stanley DW, Inc.*, 333 Fed. Appx. 605, 606 (2d Cir. 2009); *Tamari* v. *Bache & Co. (Lebanon) S.A.L.*, 565 F.2d 1194, 1202 (7th Cir. 1977), cert. denied, 435 U.S. 905, 98 S. Ct. 1450, 55 L. Ed. 2d 495 (1978). "[I]t is a well-settled proposition that judicial review of an arbitration award should be, and is, very narrowly limited. . . . A federal court may vacate or modify an arbitration award only if one of the grounds specified in 9 U.S.C. §§ 10 & 11 is found to exist." (Citations omitted.) *Diapulse Corp. of America* v. *Carba, Ltd.*, 626 F.2d 1108, 1110 (2d Cir.

---

[6] Section 11 of title 9 of the United States Code contains nearly identical language to § 52-419. See 9 U.S.C. § 11 (2008).

[7] Section 12 of title 9 of the United States Code provides in relevant part: "Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered. . . ."

1980); see *Barbier* v. *Shearson Lehman Hutton, Inc.*, 948 F.2d 117, 120 (2d Cir. 1991); *Hartford Lloyd's Ins. Co.* v. *Teachworth*, 898 F.2d 1058, 1061 (5th Cir. 1990). "When . . . a suit is in substance no more than a collateral attack on the award itself, it is governed by the provisions of the [Federal Arbitration Act]." *Foster* v. *Turley*, supra, 42.

*Corey* v. *New York Stock Exchange*, supra, 691 F.2d 1211, is the leading case on whether a complaint that is based on conduct related to a prior arbitration alleges separate and independent claims or constitutes an impermissible collateral attack on a prior arbitration award. In *Corey*, the plaintiff sought punitive damages from the New York Stock Exchange (NYSE), alleging that its assistant arbitration director deprived him of a fair hearing because the assistant arbitration director selected members of the arbitration panel in violation of NYSE rules and adjourned and rescheduled hearings over the plaintiff's objection. The United States Court of Appeals for the Sixth Circuit held that the plaintiff's allegations of wrongdoing were within the scope of 9 U.S.C. § 10 and constituted a collateral attack against the arbitration award. Id., 1211–12. The court said: "Corey was not harmed by the selection of the arbitrators and the adjournments of the hearings in and of themselves . . . . Rather, he was harmed by the impact these acts had on the award. Corey's complaint has no purpose other than to challenge the very wrongs affecting the award for which review is provided under [§] 10 of the [Federal Arbitration Act]. . . . Very simply, Corey did not avail himself of the review provisions of [§] 10 of the [a]rbitration [a]ct and may not transform what would ordinarily constitute an impermissible collateral attack into a proper independent direct action by changing defendants and altering the relief sought." Id., 1213. Additionally, the court noted: "To confine challenges to an award within the scope of [§§] 10 and 11

exclusively to the review provisions of the [a]rbitration [a]ct is also consistent with [§] 12 of that [a]ct. The three month notice requirement in [§] 12 for an appeal of the award on [§] 10 or [§] 11 grounds is meaningless if a party to the arbitration proceedings may bring an independent direct action asserting such claims outside of the statutory time period provided for in [§] 12." Id., 1212–13.

The Sixth Circuit ruled on this issue more recently in *Decker* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 205 F.3d 906 (6th Cir. 2000). In that case, the plaintiff participated in an NASD arbitration hearing and received an arbitration award. Id., 907. Thereafter, the plaintiff filed a complaint, claiming that the defendant, Merrill Lynch, Pierce, Fenner and Smith, Inc. (Merrill Lynch), improperly interfered with the arbitration when a subsidiary of Merrill Lynch hired the chairperson of the arbitration panel to act as a closing agent for various unrelated real estate transactions. Id. Commenting on the nature of the complaint, the court stated: "Decker does not challenge the validity of her contract to arbitrate with Merrill Lynch. Nor does she seek to vacate, modify, or correct the arbitration award. Instead, Decker makes several claims under contract and tort law that she argues constitute an independent action." Id., 909.

In affirming the United States District Court's granting of Merrill Lynch's motion to dismiss, the Sixth Circuit held: "Like the plaintiff in *Corey*, Decker's alleged prejudice did not result when the Merrill Lynch subsidiary hired the chairperson of the arbitration panel to perform legal services, but instead resulted from the impact of this action on the arbitration award. Her ultimate objective in this damages suit is to rectify the alleged harm she suffered by receiving a smaller arbitration award than she would have received in the absence of the chairperson's relationship with Merrill Lynch. In

order to pursue this objective, Decker should have filed a motion to vacate the arbitration award under the [Federal Arbitration Act] by claiming that 'the award was procured by corruption, fraud, or undue means' . . . . 9 U.S.C. § 10 (a) (1)-(2). . . . Because Decker chose to attack collaterally the arbitration award in violation of the [Federal Arbitration Act], she fails to state a claim upon which relief may be granted." (Citation omitted.) *Decker* v. *Merrill Lynch, Pierce, Fenner & Smith,* supra, 205 F.3d 910. In response to a public policy argument by the plaintiff that the court's decision would encourage fraud and deceit in the arbitration process, the court responded: "[I]n light of the strong federal policy in favor of enforcing arbitration agreements, courts only have a limited role in reviewing arbitration awards as authorized under the [Federal Arbitration Act]. . . . Decker did not follow the proper procedure for challenging her arbitration award under the [Federal Arbitration Act] . . . ." (Citation omitted.) Id., 910–11.

In the present case, Ungerland alleges that the defendants: (1) falsely claimed that certain records were destroyed on September 11, 2001; (2) destroyed documents evidencing false and fraudulent representations made to the plaintiff; and (3) destroyed the evidence with the intent of depriving Ungerland and other individuals engaged in arbitration with the defendants the evidence necessary to prove their arbitration claims. As a result of this conduct, Ungerland claims that she has suffered damages because she was "thereby unable to establish a prima facie case in support of her claims . . . and as a consequence thereof, said claims failed in the NASD arbitration . . . ."

The reasoning of the Sixth Circuit in both *Decker* and *Corey*, is persuasive in this case. As in both of those cases, Ungerland did not seek to vacate, modify or correct the arbitration award under the Federal Arbitration Act in federal court and did not seek to do the

same in this court under the Connecticut statutes analogous to the Federal Arbitration Act, General Statutes § 52-408 et seq. See *Decker* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, supra, 205 F.3d 909; *Corey* v. *New York Stock Exchange*, supra, 691 F.2d 1212–13. Rather, she has filed a complaint containing allegations that she argues constitute a separate and independent action from the arbitration. See *Decker* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, supra, 909; *Corey* v. *New York Stock Exchange*, supra, 1213. However, although she attempts to distinguish her complaint from *Decker* and *Corey*, it is impossible to separate out the impact of Morgan Stanley's misconduct on the arbitration award. See *Decker* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, supra, 910. It appears then, as was the case in *Decker* and *Corey*, Ungerland's ultimate objective is actually to rectify the alleged harm she suffered in receiving a smaller arbitration award than she would have received in the absence of Morgan Stanley's alleged misconduct during the arbitration proceeding.[8]

---

[8] As noted previously, in his second affidavit submitted in opposition to the motion to dismiss, the plaintiff's counsel asserts that had "they" known of Morgan Stanley's misconduct, they "could and would have presented a separate claim on behalf of the plaintiff during the underlying arbitration for damages and sanctions as to such misconduct, independent of whether the misconduct may have impacted the outcome of the underlying arbitration." Affidavit of Thomas P. Willcutts, November 9, 2009, exhibit 6 to the plaintiff's opposition memorandum to the motion to dismiss. Although the plaintiff contends that the present lawsuit is brought to vindicate this entirely separate claim, the court finds otherwise. Paragraphs 10 and 15 of the plaintiff's complaint state that the defendant's misconduct rendered the plaintiff unable to establish a prima facie case in the arbitration and, as a result, she was unable to sustain her claim for damages. Based on the plain meaning of these allegations, the conclusion is inescapable that the instant lawsuit was brought primarily to redress perceived misconduct of Morgan Stanley which directly impacted the plaintiff's arbitration award by depriving her of the ability to present evidence of her damages and not simply in pursuit of "damages and sanctions as to such misconduct . . . ." Her counsel's affidavit to the contrary notwithstanding constitutes a contradiction which undermines the plaintiff's assertion that the spoliation and CUTPA claims made in the instant complaint do not constitute a collateral attack on the arbitration award.

See id. Therefore, under federal substantive law, Ungerland should have filed a motion to vacate the arbitration award under either 9 U.S.C. § 10 (a) (2), in federal court, or § 52-418 (a) (1), in this court, by claiming that "the award [was] procured by corruption, fraud or undue means . . . ." See id. Instead, Ungerland has filed this action, which the court concludes is an impermissible collateral attack on the arbitration award in violation of both 9 U.S.C. § 10 of the Federal Arbitration Act and, as discussed below, § 52-418.

*Decker* and *Corey* are not the only federal circuit court cases supporting the court's conclusion. See *Ibarzabal* v. *Morgan Stanley DW, Inc.*, supra, 333 Fed. Appx. 606 (claims barred by Federal Arbitration Act); *Gulf Petro Trading Co.* v. *Nigerian National Petroleum Corp.*, 512 F.3d 742, 750 (5th Cir. 2008) (complaint amounted to no more than collateral attack on foreign arbitration award); *Sander* v. *Weyerhaeuser Co.*, 966 F.2d 501, 503 (9th Cir. 1992) (plaintiff's suit, a collateral attack under the "guise of an independent suit," was barred by three month statutory limitation of 9 U.S.C. § 12); *Foster* v. *Turley*, supra, 808 F.2d 41–42 (plaintiff's suit was collateral attack on prior arbitration award); *Tamari* v. *Bache & Co. (Lebanon) S.A.L.*, supra, 565 F.2d 1202 (allegations of misconduct in arbitration proceedings reviewable only under § 10 of Federal Arbitration Act).

Further, two federal District Court opinions provide particularly persuasive support for concluding that the present action is an impermissible collateral attack on an arbitration award. In both cases, the courts dismissed complaints based on the same alleged arbitration misconduct by Morgan Stanley as alleged by Ungerland herein. See *Ibarzabal* v. *Morgan Stanley DW, Inc.*, United States District Court, Docket No. 07 CIV 2273 (SCR) (S.D.N.Y. December 5, 2007) ("[t]he injuries

alleged by [the plaintiffs] are predicated on the impact of [Morgan Stanley's] alleged conduct on the outcomes of their arbitration proceedings; accordingly, this [c]ourt must view the instant action as an attempt . . . to collaterally attack those awards") aff'd, 333 Fed. Appx. 605 (2d Cir. 2009); *Quintana* v. *Morgan Stanley DW, Inc.*, United States District Court, Docket No. 05-21401-CIV (S.D. Fla. December 7, 2005) ("[b]ecause the essence of the [c]omplaint is that [the defendant's] failure to disclose the as yet identified documents during their arbitration resulted in an unfair outcome . . . [the plaintiffs'] [c]omplaint does not state claims independent of an attack on their individual arbitration proceedings").

As clearly stated in §§ 52-419 and 52-420, under Connecticut law, if a party to an arbitration wishes to attack the arbitration award on grounds of fraud, it must do so within thirty days of receiving notice of the award. See *Wu* v. *Chang*, 264 Conn. 307, 313, 823 A.2d 1197 (2003). In *Wu* v. *Chang*, supra, 309, the plaintiffs filed with the Superior Court an application to confirm an arbitration award pursuant to § 52-417. Thereafter, the court held a hearing during which the defendant objected to the confirmation, claimed that he had discovered evidence indicating that one of the plaintiffs had defrauded him, and requested an opportunity to present evidence in support of this claim of fraud. Id. The court treated the defendant's objection as a motion to vacate the award under § 52-420; id., 309–10; rejected the request to present evidence and denied the motion to vacate, "conclud[ing] that it lacked subject matter jurisdiction over the motion inasmuch as the motion was not made within the thirty day limitation period set forth in § 52-420 (b)." Id., 310. The defendant appealed. Id.

In interpreting §§ 52-417, 52-418 and 52-420, the Supreme Court initially said: "Section 52-420 (b)

requires that a motion to vacate an arbitration award be filed within thirty days of the notice of the award to the moving party. If the motion is not filed within the thirty day time limit, the trial court does not have subject matter jurisdiction over the motion. . . . Because it is uncontested that [the defendant] did not move or otherwise file an application to vacate the arbitration award within the thirty day limitation period of § 52-420 (b), the trial court granted the timely filed application of [the plaintiffs] to confirm the award." (Citations omitted; internal quotation marks omitted.) Id., 312.

Despite the requirement of § 52-420 (b), the defendant in *Wu* argued "that the thirty day limitation period set forth in § 52-420 (b) was tolled by his claim of fraud and, consequently, the trial court improperly concluded that it lacked jurisdiction to entertain his motion to vacate." Id., 310. The Supreme Court considered this argument but maintained its decision to affirm the judgment of the trial court, stating: "The statutory framework governing the arbitration process expressly covers claims of fraud. Specifically, General Statutes § 52-418 (a) requires a court to make an order vacating [an arbitration] award if it finds . . . [that] the award has been procured by corruption, *fraud* or undue means . . . . (Emphasis added.) Under § 52-420 (b), however, a party seeking an order to vacate an arbitration award on grounds of corruption, fraud or undue means—or on any other ground set forth in § 52-418—must do so within the thirty day limitation period set forth in § 52-420 (b). . . . To conclude otherwise would be contrary not only to the clear intent of the legislature as expressed in §§ 52-417, 52-418 and 52-420 (b), but also to a primary goal of arbitration, namely, the efficient, economical and expeditious resolution of private disputes." (Citation omitted; internal quotation marks

omitted.) Id., 313; see also *Pisciotta* v. *Shearson Lehman Bros., Inc.*, 629 A.2d 520, 523 (D.C. 1993) (independent suit for fraud in the arbitration process dismissed where the appellants took no action under the District of Columbia Uniform Arbitration Act within its ninety day time limit), cert. denied, 510 U.S. 1044, 114 S. Ct. 690, 126 L. Ed. 2d 657 (1994).

*Wu* controls arbitrations that are governed by Connecticut procedural law. Ungerland's action is based on claims of fraud by the defendants during the underlying arbitration. The statement of the arbitration award, as attached to the affidavit of the defendants' counsel, shows that the statement was signed by the arbitrators on August 6, 2003. The notice to the plaintiff of FINRA's settlement with Morgan Stanley (referenced, supra, in footnote 1 of this opinion) was dated March 20, 2009. This action was filed on June 12, 2009. Ungerland argues that by virtue of the March 20, 2009 notice of settlement, the NASD arbitration award at issue in this case was in effect reopened by FINRA, as consented to by Morgan Stanley. She further argues that, pursuant to the terms of the settlement, because she was under no compulsion to participate in the limited settlement proposed, she is not precluded from pursuing other remedies seeking punishment of Morgan Stanley for the failure to produce pre-September 11, 2001 e-mail or other updates to Morgan Stanley's "Manager's Policies and Procedures Manual" subject of arbitration discovery.

In support of the foregoing position, the plaintiff relies on three documents submitted as exhibits to her opposition memorandum. First, she cites FINRA's November 15, 2007 press release, titled "Notices to Members, Disciplinary Actions," in support of her argument. (See exhibit 2 to plaintiff's opposition memorandum.) The release reports on the settlement between FINRA and Morgan Stanley of the formal regulatory charges against Morgan Stanley originally filed by NASD

in December, 2006.[9] Conspicuously missing from the release is any statement to the effect that, pursuant to the settlement, the arbitration cases were reopened. While it does say that Morgan Stanley consented to the entry of FINRA's findings, it also states that in doing so, "Morgan Stanley neither admitted nor denied the charges . . . ."

Second, Ungerland cites Morgan Stanley's letter of acceptance, waiver and consent, number 2005001449202, signed by a Morgan Stanley representative on September 19, 2007, and accepted by FINRA on September 24, 2007. (See exhibit 3 to plaintiff's opposition memorandum.) As in the press release, there is no mention, even by implication, that, pursuant to the settlement, the arbitration awards were reopened.

Third, Ungerland relies on the "notice of settlement" she received, dated March 20, 2009, in support of her claim that she was not required to participate in the FINRA and Morgan Stanley settlement to justify bringing her present complaint. As previously addressed in this memorandum,[10] while it is true, that the terms of the notice indicate that Ungerland was not required to participate in the FINRA and Morgan Stanley settlement, it does not support the interpretation that her ability to opt out somehow constitutes a reopening of the arbitration awards.

---

[9] *In pertinent part, the press release states:* "FINRA found that [Morgan Stanley] failed to provide pre-9/11 e-mails to claimants in numerous arbitration proceedings and in response to three regulatory inquiries during the period from October 2001 through March 2005. . . . FINRA also found that [Morgan Stanley] later destroyed many of the pre-9/11 e-mails it did possess. . . . In addition, FINRA found that [Morgan Stanley] failed to provide updates to the firm's supervisory manual for branch office managers to claimants in numerous arbitration proceedings over a period of years." According to the release, in settlement, Morgan Stanley was required to deposit $9.5 million into a fund to pay current and former customers who had arbitration claims against the firm for the discovery failures.

[10] See footnote 1 of this opinion.

In sum, Ungerland has offered no persuasive argument to convince this court to agree with her position that the 2003 NASD arbitration was reopened by virtue of FINRA's settlement with Morgan Stanley pursuant to the notice sent to investors in March, 2009. As discussed in this memorandum, the case law interpreting the Federal Arbitration Act and the analogous Connecticut statutes, as described above, mandate this court to find otherwise.

In a final argument, Ungerland compares her case to *Mian* v. *Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085 (2d Cir. 1993). In that case, the plaintiff filed an action, pursuant to 42 U.S.C. § 1981, in United States District Court against the defendants for discriminating against him because of his race during the course of an arbitration proceeding pertaining to the handling of his securities accounts by the defendants. Id., 1086. On appeal, the court held that "[t]he procedures established by 9 U.S.C. §§ 10 and 12 are normally the exclusive remedy to challenge the results of an arbitration proceeding. . . . However, Mian's failure to move to vacate the arbitration award within the time prescribed by 9 U.S.C. § 12 does not prevent him from seeking to recover damages for alleged civil rights violations that occurred during the arbitration proceeding itself." (Citation omitted.) Id., 1086–87. It further stated, "[t]he fact that a major component of the damages sought would consist of the amount of the arbitration award . . . does not mean that Mian's suit is one to challenge the award within the meaning of § 10 of the Federal Arbitration Act." Id., 1087.

Although *Mian* created an exception to the general rule that the Federal Arbitration Act is the exclusive remedy to challenge the results of an arbitration proceeding, the exception is a limited one. *Ibarzabal* v. *Morgan Stanley DW, Inc.*, supra, 333 Fed. Appx. 606. In *Ibarzabal* v. *Morgan Stanley DW, Inc.*, supra, United

States District Court, Docket No. 07 CIV 2273 (SCR), the plaintiffs filed a diversity suit against Morgan Stanley, alleging deceptive trade practices in violation of New York's consumer protection statute, common-law fraud and breach of contract. As previously discussed, the claims in that lawsuit were based on the same alleged misconduct by Morgan Stanley during arbitration proceedings underlying the present case. See id. The District Court concluded that the plaintiffs' claims were barred by the Federal Arbitration Act, a decision affirmed by the United States Court of Appeals for the Second Circuit. *Ibarzabal* v. *Morgan Stanley DW, Inc.*, supra, 605.

In dismissing the *Ibarzabal* appellants' argument for application of an exception under *Mian*, the District Court noted that *Mian* "hinged on the specific nature of 42 U.S.C. § 1981 . . . which . . . 'prohibits discrimination that infects the legal process in ways that prevent one from enforcing contract rights, by reason of his or her race, and . . . covers wholly private efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes.' . . . The plaintiffs do not assert any claims under [§] 1981 or any analog to it, and we have been given no reason to expand *Mian*'s narrow exception to apply to the claims brought here." (Citation omitted.) Id., 606. The Second Circuit's reasoning is compelling. Herein, Ungerland has not asserted any claims under § 1981, or any other federal or state statute that might be an analog to it. See id. Therefore, *Mian* has no effect on the present case.

For all the foregoing reasons, the court finds that the only procedural mechanism available to the plaintiff was to file a motion to vacate the arbitration award within the time allowed by § 52-418 (a) (1), and, therefore, the claims set forth in her complaint constitute an impermissible collateral attack on the arbitration

award. "[O]nce the thirty day limitation period of § 52-420 (b) has passed, the award may not thereafter be attacked on any of the grounds specified in . . . § 52-418 . . . including fraud." (Citation omitted.) *Wu* v. *Chang*, supra, 264 Conn. 313.[11] Accordingly, the court lacks subject matter jurisdiction over the claims set forth in the plaintiff's complaint.

## CONCLUSION

For the reasons set forth in this memorandum of decision, the defendants' motion to dismiss is hereby granted for lack of subject matter jurisdiction.

---

[11] The court notes that the case law suggests that any tolling argument based on fraud may be addressed in the context of a motion to vacate made in the proper forum. See *Prudential Securities, Inc.* v. *Hornsby*, 865 F. Sup. 447, 452 (N.D. Ill. 1994), wherein the court states: "Hornsby argues that he may prosecute his NASD claim because Prudential's fraudulent concealment prevented him from finding the smoking gun within the three month time limit for [§] 10 motions. Any other result, Hornsby argues, would reward parties for three months of successful post-award fraud. This issue is not ripe. The question of whether [§] 10 may be equitably tolled is precisely that—a [§] 10 issue, and the proper procedure for advancing the tolling argument is in a [§] 10 motion. Hornsby has not filed a [§] 10 motion. Moreover, the tolling issue is premature even in light of the court's conclusions about the character of Hornsby's NASD proceeding. If the NASD proceeding is treated as a motion to modify akin to [§] 10, that motion is brought in the wrong forum. A motion for [§] 10 relief must be filed in federal court, not before a different arbitration organization. 9 U.S.C. § 10. As a result, the court expresses no opinion on Hornsby's equitable tolling argument except to note that it does not save his NASD claim."